903 F.2d 996
 5 Indiv.Empl.Rts.Cas. 1527
 James Edward JOHNSON, Plaintiff-Appellee,
v.
Edward C. MORRIS, Individually and in his capacity as Deputy
Director for Adult Institutions for the Virginia Department
of Corrections; Edward Murray, Individually and in his
capacity as Director of the Virginia Department of
Corrections, Defendants-Appellants.
 No. 89-1761.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 8, 1990.
Decided May 21, 1990.
 
 Henry M. Massie, Jr., Sands, Anderson, Marks & Miller, Richmond, Va., for defendants-appellants.
 Sa'ad El-Amin, El-Amin & Associates, Richmond, Va., for plaintiff-appellee.
 Robert B. Delano, Jr., Sands, Anderson, Marks & Miller, on brief, Richmond, Va., for defendants-appellants.
 Before ERVIN, Chief Judge, and HALL and WILKINS, Circuit Judges.
 WILKINS, Circuit Judge:
 
 
 1
 Edward W. Murray and Edward C. Morris appeal the judgment of the district court entered in favor of James E. Johnson on his claim that he was deprived of a protected liberty interest without due process of law in violation of the fourteenth amendment and 42 U.S.C.A. Sec. 1983 (West 1981). Finding no liberty interest implicated, we reverse.
 
 I.
 
 2
 Johnson is an employee of the Virginia Department of Corrections, and at the time of the events surrounding this litigation he held the position of Warden of Buckingham Correctional Center. Murray and Morris are also employees of the Department--Murray as Director of Corrections and Morris as Deputy Director of Corrections for Adult Institutions.
 
 
 3
 On March 31, 1988, a disturbance occurred at Buckingham. A Serious Incident Report (SIR) prepared by the Watch Commander stated that a group of inmates had refused to return to their cells and "[a] minimum amount of force and a small amount of mace was used to move inmates into the buildings." Although the SIR did not indicate that any injuries occurred, on the same date as the disturbance an Inmate Accident/Injury Report was completed by a nurse at Buckingham, stating that John Brown, an inmate, had been involved in an altercation with security and five sutures were required to close a laceration on his forehead.
 
 
 4
 In December 1988 Johnson's supervisor received an anonymous letter concerning the March 31 incident. The letter charged "that an inmate at Buckingham Correctional Center ... was assaulted by the Warden of that institution while [the inmate was] in handcuffs...." The letter was forwarded to the Office of Inspector General of Corrections, and E.R. Barrack of that office was assigned to investigate this allegation. On December 22, during a brief interview with Barrack, Johnson stated that during the effort to force inmates back to their cells, inmate Brown spit in his face and swore at him. Johnson further stated that he instinctively hit Brown in the face knocking him down. As far as injuries were concerned, he contended that he did not see any and was not aware of any at the time the SIR was completed.
 
 
 5
 Johnson subsequently learned that he was being investigated for striking a handcuffed inmate and on January 18, 1989, met with Barrack a second time. During this interview, he repeated his earlier statement in more detail and contended that at the time of the confrontation Brown was "not cuffed or anything else." Barrack issued a report to Morris on January 27, 1989, containing summaries of interviews with Johnson and Brown as well as summaries of statements of other witnesses who requested anonymity. The report indicated that the statements confirmed that Johnson had been involved in a confrontation with Brown and that he had struck Brown while Brown was handcuffed and being restrained by other correctional officers.
 
 
 6
 During an interview with Morris several days later, Johnson repeated the statements he earlier made to Barrack. When asked by Johnson, Morris declined to identify the witnesses who had requested anonymity or to furnish the contents of their statements to Johnson. Although Morris concluded that he should recommend to Murray that Johnson be demoted and transferred, he nevertheless set up a second meeting with Johnson with the hope that Johnson would "come back and tell the truth." At this second meeting, Morris again refused to identify the witnesses or divulge the contents of their statements. He did advise Johnson that he was recommending demotion and transfer and suggested that Johnson go on paid annual leave until resolution of the investigation. Morris forwarded the report to Murray who requested and received statements from the officers who allegedly held Brown while Johnson struck him. Based on the report and these statements, Murray concurred in Morris' recommendation, and Johnson was demoted and transferred.
 
 
 7
 At least two accounts of the actions taken against Johnson appeared in the press. On February 4, 1989, the Charlottesville Daily Progress reported that Johnson had been "placed on paid annual leave pending an official review of his performance." A spokesman for the Department of Corrections stated that officials were investigating Johnson but "would not comment on the nature of the investigation." On February 11, 1989, the Richmond Times Dispatch reported that Johnson had been reassigned after an investigation "found he had struck an inmate." The Times Dispatch also reported that a spokesman for Murray confirmed that the investigation into "an allegation that an inmate was struck proved the accusation to be 'well founded.' "
 
 
 8
 Johnson filed suit in federal district court against Murray and Morris alleging that (1) he was denied his right to a state grievance procedure, (2) he was deprived of a property interest without due process, and (3) he was deprived of a liberty interest without due process. The district court dismissed the first two counts pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.* After a bench trial on the third count, the district court found that a liberty interest was implicated by the public announcement of the reasons for Johnson's demotion, that due process required notice and an opportunity to be heard, and that Johnson had been denied both.
 
 
 9
 During discovery, Johnson received copies of the investigative file, including all statements, the inmate file, and the personnel files of all employees of the Department of Corrections who supplied information during the investigation. This material was furnished to him pursuant to a protective order that limited its use and prevented release of the information. After holding that due process required that Johnson be given notice and a hearing, the district court lifted the protective order for the purpose of allowing Johnson to use the information in an informal name-clearing hearing. Although Murray had previously offered to hold a name-clearing hearing for Johnson, the district court agreed with Johnson's contention that the hearing would not provide him with a meaningful opportunity to clear his name unless he was given access to the identities and statements of the witnesses. After the district court lifted the protective order to allow Johnson to use this material, Johnson inexplicably declined to participate in a name-clearing hearing. Indeed, at oral argument counsel for Murray and Morris represented that the offer to hold a hearing remained open. In response to a question from the court, Johnson's counsel stated that Johnson would continue to decline this offer. No reason was given other than that Johnson, even though given full opportunity, simply had no desire to participate in a hearing.
 
 II.
 
 10
 The issue here is whether Johnson was deprived of a liberty interest because a public announcement of the reasons for his demotion was made. "[I]n order to claim entitlement to the protections of the due process clause ... a plaintiff must first show that he has a constitutionally protected 'liberty' or 'property' interest, and that he has been 'deprived' of that protected interest by some form of 'state action.' " Stone v. University of Maryland Medical Sys. Corp., 855 F.2d 167, 172 (4th Cir.1988) (citations omitted). The Supreme Court has acknowledged that " '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' " Board of Regents of State Colleges v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) (quoting Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971)). The Court noted that "[t]he purpose of such notice and hearing is to provide the person an opportunity to clear his name." Id. 408 U.S. at 573 n. 12, 92 S.Ct. at 2707 n. 12. We have recognized that a liberty interest is implicated by public announcement of reasons for an employee's discharge. See Boston v. Webb, 783 F.2d 1163, 1166 (4th Cir.1986). In Boston the interest was defined as "that of being free from arbitrary restrictions upon the opportunity for other gainful employment stemming from the reasons voluntarily given by government for lawfully terminating ... at-will public employment." Id. at 1167. It should be noted that the interest protected is "not to remain employed ... but ... merely to 'clear [one's] name' against unfounded charges." Id.
 
 
 11
 The district court noted that although Johnson was not discharged, there was a public announcement of the reasons for his demotion and transfer and that this was sufficient to implicate a liberty interest. The court reasoned that Johnson's career had been "derailed" and to deny him a protected liberty interest simply because he was not discharged "would be recognizing a distinction without a difference."
 
 III.
 
 12
 We do not agree that a liberty interest was implicated. Publication of stigmatizing charges alone, without damage to "tangible interests such as employment," does not invoke the due process clause. Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). As the Supreme Court pointed out in Paul, "[t]he words 'liberty' and 'property' as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law." Id. Thus, for a liberty interest to have been implicated, some damage to Johnson's employment status must have resulted from publication of the reasons for his demotion.
 
 
 13
 Johnson, who remains employed with the Department of Corrections, suffered no damage to his employment status as a result of the publications. His situation differs from that in which a discharged employee's "opportunity for other gainful employment" is thwarted by the publication of the reasons for his discharge. See Boston, 783 F.2d at 1167. We agree with the Seventh Circuit which held that when a police officer is suspended but not discharged he "cannot complain that he has been made unemployable; he remains employed." Hershinow v. Bonamarte, 735 F.2d 264, 266 (7th Cir.1984).
 
 
 14
 Johnson contends, however, that future career opportunities with the Department of Corrections have been adversely affected. Perhaps, but nevertheless any "derailment" of his career caused by the demotion and transfer was the result of the findings made by Murray and Morris, not the result of the publication of those findings. It may be true that Johnson's chances for advancement within the Department of Corrections may now be limited. "But if that were a basis for claiming damages for a deprivation of liberty, ... the federal courts would become the grievance machinery for public-sector employees." Id. Because Johnson has not been deprived of a liberty interest, the order of the district court holding that he is entitled to notice and a hearing is reversed. Because Johnson has rejected all offers to hold a name-clearing hearing, the order of the district court lifting the protective order to allow him to use material obtained during discovery is also reversed. Consequently, the district court is directed to enter judgment for appellants.
 
 
 15
 REVERSED.
 
 
 
 *
 Johnson does not appeal the dismissal of these counts