Debra ECHTENKAMP, Plaintiff,

v.

LOUDON COUNTY PUBLIC SCHOOLS, Douglas Holmes, David Weisman, Elizabeth Young, Roberta Rehm, Kelly Trenary, Jacqueline Sakati, and John Lody, Defendants.

No. CIV.A. 03–538–A.

United States District Court,
E.D. Virginia.
Alexandria Division.

June 24, 2003.

Elaine C. Bredehoft, Charleson Bredehoft PC, Reston, VA, for Plaintiffs.

Julia Bougie Judkins, Trichilo, Bancroft, McGavin, Horvath & Judkins, PC, Fairfax, VA, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiff, a school psychologist, brings this action against the school system and several individual defendants, claiming violations of her Fourteenth Amendment due process rights, First Amendment retaliation, and defamation. More specifically, plaintiff alleges that she was placed on probationary status and threatened with dismissal without due process of law and in retaliation for her criticism of the school system's special education policies[1] and that she was defamed by her supervisors and co-workers. In essence, this case presents the not uncommon question of the degree to which the federal courts, in the name of vindicating federal constitutional rights, must intrude in the typical workplace frictions and disputes among personnel in a public school system.

## I.

Plaintiff Debra Echtenkamp, a resident of Leesburg, Virginia, has served since August 1995 as a school psychologist for defendant Loudon County Public Schools (LCPS). On April 28, 2003, plaintiff filed this action against LCPS, four school officials, namely Douglas Holmes, the Assistant Superintendent of Pupil Services; David Weisman, Director of Student Services; Elizabeth Young, Supervisor of Student Services; and John Lody, Supervisor of Diagnostic Services, and three co-workers, namely Kelly Trenary, a Special Education counselor; Jacqueline Sakati, a school social worker; and Roberta Rehm, a Special Education teacher at Potomac Falls High School. All individual defendants are Virginia residents.

According to the facts as alleged in the complaint,[2] plaintiff had an excellent record of service, working with more than twenty schools and becoming a leader within her department, until September 2001, when the series of adverse actions alleged in the complaint commenced, allegedly in retaliation for plaintiff's criticism of certain changes in LCPS's special education policies. Plaintiff alleges (i) a pattern of interference with her job autonomy, authority, and responsibilities, (ii) false statements regarding her work performance, and (iii) unwarranted disciplinary action, culminating in her placement on an evaluation list, an unsatisfactory per

---

1. This term, used but not defined by plaintiff, refers generally to school system policies and programs for disabled children, as regulated by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, and the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 701 *et seq.*

2. On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), Fed.R.Civ.P., the plaintiff's allegations must be taken as true and construed in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir.1999).

formance rating, and the threat of termination. Plaintiff claims that these actions were all part of an ongoing effort led by defendant Douglas Holmes, joined by other supervisors and co-workers, to discredit plaintiff's work and render her workplace intolerable.

Plaintiff's criticism of the LCPS's special education policies began some time prior to September 2001, when Holmes proposed changes to the policies that plaintiff believed violated professional standards for school psychologists, presented ethical conflicts, and were not in the best interests of those children entitled to the benefits of the ADA, 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* In the months after September 2001, plaintiff was involved in a number of committees challenging the proposed changes. In addition, during May and June of 2002, plaintiff advocated for the rights of a specific child with a disability, but the services she recommended were not placed in the child's Individualized Education Plan, allegedly on Holmes's instructions and, in plaintiff's view, in violation of the child's rights. Next, on July 8, 2002, plaintiff sent an email to the Eligibility Coordinators and her colleagues detailing how a directive from Holmes regarding § 504 of the Rehabilitation Act was overly restrictive, contrary to an earlier memorandum by the Department of Education, and contrary to law.

According to the complaint, plaintiff's continued challenges to LCPS's special education policies led to a series of allegedly retaliatory acts, summarized briefly as follows:

(i) On September 13, 2001, plaintiff was late for a meeting owing to heavy traffic. Thereafter, Holmes launched a two week investigation into plaintiff's absenteeism and unavailability, which plaintiff maintains was utterly unfounded and uncovered nothing. A letter of reprimand was placed in her file regarding her lateness on September 13, 2001. Plaintiff claims this is unusual treatment and unduly harsh for a single instance of tardiness.

(ii) On August 13, 2002, plaintiff was called to a meeting with Holmes and defendant Elizabeth Young, at which she was reprimanded for not being supportive of a certain counseling program, and was directed not to commit to other counseling initiatives and to obtain consent prior to starting new initiatives. Plaintiff alleges the reprimand and the subsequent restriction were baseless.

(iii) On September 6, 2002, Holmes called plaintiff to a meeting with him and defendant David Weisman, the new Director of Student Services. Holmes criticized plaintiff's handling of old cases and a single recent case, and plaintiff was put on an evaluation cycle for one year. Plaintiff alleges her handling of the cases was proper and according to policy and that this criticism was unsubstantiated and retaliatory.

(iv) On October 4, 2002, plaintiff received a letter from Weisman accusing her of altering a parent permission form created by Holmes, despite express instructions from defendant Kelly Trenary not to change the contents of the form. Plaintiff contends that such alterations were routine, that the alteration was not substantial, and that a co-worker can vouch for the fact that Trenary did not tell her not to alter the form.

(v) During the week of October 23, 2002, Weisman attempted to reach plaintiff with a question while she was in transition between schools. He reprimanded her for not returning his message, exaggerated the number of times he tried to call her, and implied that she used her lunchtime inappropriately. Again, plaintiff maintains that these charges are baseless.

(vi) During a November 25, 2002 "emergency meeting" at Weisman's office, defendant Jacqueline Sakati accused plaintiff of being insulting to her during a counseling session, and plaintiff was reprimanded. Plaintiff alleges that she did not behave improperly during the session, and furthermore that she had previously complained to Weisman regarding Sakati's rude behavior, and no action was taken. Plaintiff also alleges that Sakati behaved unprofessionally during the November 25 meeting itself. Weisman told Young to observe plaintiff during the counseling group with Sakati. At a December 10, 2002 meeting to discuss Young's observation of the group counseling session, Young criticized plaintiff's counseling skills and suggested she be more passive and allow Sakati to lead the sessions.

(vii) On November 26, 2002, during a meeting between Weisman and plaintiff to discuss Weisman's concerns regarding plaintiff's handling of a student returning to school after the student had threatened to kill classmates, Weisman accused plaintiff of mishandling the case and not obtaining parental permission to conduct an evaluation of a student. Plaintiff alleges that Weisman had previously discussed the case with her and had not told her parental permission was required.

(viii) On December 12, 2002, Weisman informed plaintiff that, as a result of her unsatisfactory performance, she was being placed on the "December List" submitted to the Department of Personnel Services, which served as notification that plaintiff was in danger of not having her contract renewed the following year. She was presented with a memorandum reviewing prior complaints about her and informing her that her performance rating at that point was "unsatisfactory." Plaintiff alleges that in assigning her the unsatisfactory rating, Weisman had not contacted either the administrators at plaintiff's schools to obtain information regarding her performance, or any of the co-leaders who work with her.

(ix) In January of 2003, plaintiff was required to attend a meeting for all personnel on the December List. She was told that the consequences of an ultimately unsatisfactory evaluation would range from a freezing of her salary to a recommendation of termination. Plaintiff was provided resignation papers, pursuant to personnel policy. She was initially informed that if she received an unsatisfactory rating in March 2003 her supervisor "will be recommending" that her contract not be renewed, although a subsequent letter corrected this and stated that her supervisor "may be recommending" termination if her March 2003 rating is unsatisfactory. Plaintiff's improvement plan consisted almost solely of goals to improve her allegedly inappropriate behavior during clinical team meetings and the counseling group, which plaintiff maintains constituted only 5% of her duties. According to plaintiff, she was not provided a clear mechanism by which she would be measured, nor told how passing or failing would be determined, and the plan placed her in the position of being evaluated by the very people who she alleges had fabricated the complaints against her.

(x) Throughout February, March, and April, plaintiff continued to be subject to harassing acts, including being accused of misrepresenting the need to change her schedule to meet with children and being chastised for being out sick after she had followed proper procedures to inform the office of her condition. Plaintiff received neither an unsatisfactory nor a satisfactory rating on her March 2003 review which instead continued her evaluation for another year. Plaintiff alleges that all of this conduct was unwarranted and in retaliation for her actions in speaking out in favor of the rights of disabled children.

As a result of these incidents, plaintiff sought relief through the LCPS's grievance procedures. On September 30, 2002, she filed a grievance regarding Holmes's allegedly retaliatory conduct and her placement on the evaluation cycle. Two days later, plaintiff, Nancy McManus, the principal of a school at which she worked, and Matthew Britt, the Assistant Superintendent of Personnel, met to discuss her grievance. Shortly thereafter, on October 4, 2003, plaintiff received a letter from Superintendent Edgar Hatrick, refusing to accept or address plaintiff's grievance. In response, plaintiff sent a letter to Hatrick requesting that the grievance be appealed to the school board. Subsequently, on October 23, 2002, plaintiff was informed by letter from Ned Waterhouse, the Deputy Superintendent, that plaintiff's grievance failed to comply with procedural requirements, including time limits and the failure to file a Step II Grievance Request with her immediate supervisor or principal as required, and that no just cause for this failure had been shown. On October 31, 2002, plaintiff responded that she had met the procedural requirements and that the policy was vague, and requested a response in writing that she had in fact exhausted all avenues available to her through the school system. In a November 2002 meeting, Hatrick again refused to investigate her complaints and informed plaintiff that she no longer had any remedies available through the school system to resolve her complaints. Thereafter, plaintiff did not take any further steps to try to invoke the LCPS's grievance procedures.

Plaintiff also provides specific information regarding the statements by individual defendants that she claims are defamatory. These statements are all related to the incidents discussed above and the criticism of her work, judgment, and behavior by her supervisors and co-workers. Plaintiff alleges that Holmes, as part of his campaign of retaliation against her, created an atmosphere encouraging the collection of false and defamatory evidence against plaintiff. These statements are summarized as follows: Plaintiff asserts that Trenary (i) falsely told Young that plaintiff presented a counseling model with which the staff was not comfortable, that the staff interpreted as an attempt to avoid providing services, and that the staff told her was unacceptable, (ii) falsely reported to Holmes and Weisman that plaintiff was abrasive, unprofessional and rude at a September 6, 2002 meeting, and (iii) falsely told Weisman that plaintiff had altered a permission form after Trenary had told her not to.[3] Plaintiff asserts that Sakati (i) falsely reported to Young and Weisman that plaintiff had behaved inappropriately in a counseling group by insulting and contradicting Sakati, (ii) falsely told Weisman and Young that plaintiff "misinterprets a lot and she lies," and (iii) falsely reported to Weisman that plaintiff was inept at handling a situation involving two disabled students returning to a classroom. Plaintiff asserts that defendant Roberta Rehm likewise falsely reported to Weisman that plaintiff was inept at handling that situation. Plaintiff alleges that these co-worker statements were not only false, but also made with malice, with a "motive of personal spite and revenge" and to "curry favor with Mr. Holmes and Ms. Young."

With regard to plaintiff's supervisors, Weisman and defendant John Lody, plaintiff asserts that a series of statements made in their evaluations and memoranda were defamatory. These include assertions by Weisman and Lody that plaintiff "failed to maintain an adequate line of communication with other staff members,"

---

**3.** Plaintiff concedes that she altered the form, but asserts that such alterations are routine and that she was not told not to alter the form.

that two of her assessments did not meet "our professional standards," that plaintiff could be "abrasive and insulting to other committee members," that she substantially altered a student permission form "because she did not agree with the policy," that she "struggles to submit reports ... in a timely manner ... failed to provide requested information, to follow established departmental practices and to complete evaluation components," and that her "overall performance remains in need of improvement." Plaintiff alleges that these statements by her supervisors were not only false, but made with malice out of personal spite and revenge, and that the statements were directly contradicted by other observers.

Plaintiff filed this action on April 28, 2003, claiming (i) deprivation of her property interest in continued employment with the LCPS and her liberty interest in her good name and reputation without due process in violation of the Fourteenth Amendment, (ii) retaliation in violation of her rights under the First Amendment, and (iii) defamation under Virginia law.[4] Plaintiff claims as damages lost career and business opportunities owing to the restriction of her professional duties, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress, litigation costs and attorneys' fees, and other damages.

Motions to dismiss were filed on May 22, 2003. LCPS and the supervisor defendants, Holmes, Young, and Weisman filed one motion moving for dismissal of all counts in the complaint, while the co-worker defendants, Rehm, Trenary and Sakati, represented by the same counsel, filed a motion to dismiss the only count applicable to them, the defamation claim. At a June 6, 2003 hearing on the motion the matter was taken under advisement and is now ripe for disposition. Plaintiff's claims are addressed individually below.

## II.

### A. Fourteenth Amendment Due Process—Property Interest

■ The first prong of plaintiff's Fourteenth Amendment claim is that she has been deprived of her property right to continued employment without due process of law. In order to state a § 1983 claim for deprivation of property without due process, plaintiff must show (i) that she has a constitutionally protected property interest, and (ii) that she has been deprived of that interest by state action. *See Stone v. Univ. of Md. Med. Sys. Corp.,* 855 F.2d 167, 172 (4th Cir.1988); *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Once these elements are established, the question turns to what process is due and whether it has been provided. *See Stone,* 855 F.2d at 172; *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

■ To have a protected property interest, an individual "must be entitled to a benefit created and defined by a source independent of the Constitution, such as state law." *Huang v. Board of Governors,* 902 F.2d 1134, 1141 (4th Cir.1990); *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. And, it is well settled that "[i]n the context of employment in public education," a protected property interest is established by "a contract which provides for contin-

---

4. Plaintiff's complaint also includes a claim for retaliation under the Fourteenth Amendment and a non-retaliation First Amendment claim. Yet, the legal and factual bases for these additional claims are not clearly articu-lated. These additional claims are apparently the same as the non-retaliation Fourteenth Amendment claims and the First Amendment retaliation claim already asserted, and thus need not be separately treated.

ued employment, and which can be terminated only for good cause." *Royster v. Board of Trustees,* 774 F.2d 618, 620–21 (4th Cir.1985). With regard to the process due, it is well established that due process requires that "an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Loudermill,* 470 U.S. at 542, 105 S.Ct. 1487. More specifically, a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill,* 470 U.S. at 546, 105 S.Ct. 1487.

■ In this case, neither party disputes that plaintiff has been employed for more than three years and accordingly has continuing contract status pursuant to Va. Code § 22.1–303 and can only be terminated for good cause. Thus, plaintiff has a established a protected property interest in her continued employment with LCPS.

■ The next step in the Fourteenth Amendment analysis is to consider whether plaintiff has adequately alleged deprivation of this property interest. Here, she falters; plaintiff has alleged no facts sufficient to show any deprivation of that property interest, and thus cannot claim a violation of due process. The cases are clear that "any constitutionally protected interest [an employee has] as a result of his employment contract is satisfied by payment of the full compensation due under the contract." *Huang,* 902 F.2d at 1141 (citing *Royster,* 774 F.2d at 621). Thus, for example, "the transfer of tenured professors from one department to another, without loss or pay, does not implicate any property interest protected by the Due Process Clause." *Id.; see also Fields v. Durham,* 909 F.2d 94, 98 (4th Cir.1990) (holding that "the constitutionally protected property interest does not extend to the right to possess and retain a particular job

or to perform particular services" and that "no deprivation exists so long as the employee receives 'payment of the full compensation due under the contract'") (citation omitted). Significantly, it is clear from this complaint that plaintiff has not been terminated and remains a school psychologist employed by the LCPS. Although plaintiff alleges that she has suffered a loss of authority and responsibility as a result of defendants' criticism of her work and her placement on the evaluation track, plaintiff does not allege that her salary has been reduced or that she has not been provided "the full compensation due under her contract." Thus, she has not been deprived of her property interest in continued employment, and cannot allege a violation of her due process rights. *See Huang,* 902 F.2d at 1141.

■ In the face of this clear precedent to the contrary, plaintiff argues that she is entitled to due process protections because defendants *threatened* to deprive her of her continued employment. Plaintiff contends that defendants' actions—placing her on an evaluation cycle and the "December List," presenting her with resignation papers, and informing her that a continued "unsatisfactory" rating would result in termination—were sufficient to trigger her due process rights to a hearing and an opportunity to challenge the charges made against her. Specifically, plaintiff contends that Virginia law provides teachers the right to invoke grievance procedures in response to disciplinary actions short of termination, including placement on probationary status, and that the defendants did not properly follow those procedures. *See* Va.Code § 22.1–306 (defining "grievance" to include complaints relating to "disciplinary action[s] including dismissal *or placing on probation* ").

■ Even assuming plaintiff has alleged facts sufficient to make out a claim

that defendants violated state procedural rights in refusing to hear and process her grievance,[5] a violation of grievance procedures guaranteed under state law does not, by itself, constitute a failure to provide adequate due process under the standards of the federal Constitution. As the Fourth Circuit has made clear, so long as "minimal [Fourteenth Amendment] due process requirements of notice and hearing have been met," a claim that "an agency's policies or regulations have not been adhered to does not sustain an action for redress of procedural due process violations." *Goodrich v. Newport News School Bd.*, 743 F.2d 225, 227 (4th Cir.1984).[6] In other words, "the fourteenth amendment does not require a local school board to adhere to its own guidelines as long as minimum due process is accorded." *Id.* The plaintiff in the *Goodrich* case, a tenured school teacher, was provided only two interim conferences rather than the three required by the School Board's evaluation procedures.

*Id.* at 226. Nonetheless, the *Goodrich* panel concluded that no constitutional violation of due process occurred, as the plaintiff in that case was provided the constitutionally guaranteed level of process before she was terminated, namely an "adequate notice, a specification of the charges against her, and a hearing at which she was able to present her defense." *Id.* at 227. In short, *Goodrich* stands for the sensible proposition that "the enforcement of state regulations ... is to be done through the state system and not in an action under 42 U.S.C. §§ 1981 and 1983, where no federal constitutional guarantees have been violated." *Id.*[7]

In sum, the process required by the Due Process Clause is not measured by procedures provided for by state law. *Id.* Thus, plaintiff's right to invoke statutory grievance procedures in response to defendants' actions in placing her on probation is not a constitutionally protected right sufficient

---

**5.** The question whether plaintiff has stated facts sufficient to make out a violation of her state law grievance rights under Va.Code §§ 22.1–306–314 is not reached here, as it is irrelevant to the constitutional claims raised by plaintiff.

**6.** *See also McDarby v. Dinkins*, 907 F.2d 1334 (2nd Cir.1990) (citing *Goodrich* and holding that "[a] breach of procedural requirements does not create a due process violation unless an individual was 'denied a fair forum for protecting his state rights.' "); *Atencio v. Board of Education*, 658 F.2d 774, 780 (10th Cir.1981) (holding that "§ 1983 is not a vehicle for federal court correction of errors, committed by school administrators in exercise of their discretion, not rising to the level of violation of specific constitutional guarantees"); *Cf. Holland v. Rimmer*, 25 F.3d 1251, 1257 (1994) (holding that defendants' failure to provide plaintiff notice "on Form 129–01–004, as specified in the personnel manual, can hardly support a finding that he was deprived of procedural due process").

**7.** *Goodrich* is not of recent vintage and is infrequently cited. *See, e.g., Vanover v. Hant-*

*man*, 77 F.Supp.2d 91, 103 (D.D.C.1999) (citing *Goodrich* ); *McDarby v. Dinkins*, 907 F.2d 1334, 1337–38 (2nd Cir.1990) (same); *Pleasant View Elementary School PTA v. Group 1 Defendants*, 763 F.2d 652 (4th Cir.1985) (same). Nonetheless, there is no reason to suspect that its authority has been undermined. Courts typically need not face the *Goodrich* question squarely where it appears that Virginia procedural requirements have been met. *See Holland*, 25 F.3d at 1259 (holding that the defendants complied with both the process required under the Constitution and the Virginia grievance procedures). Most significantly, the *Goodrich* approach is clearly in accord with the Supreme Court's decision in *Loudermill*, issued one year after *Goodrich*, which held that procedures specified by state law do not determine the extent of process guaranteed under the Constitution. *See Loudermill*, 470 U.S. at 539–41, 105 S.Ct. 1487 (considering the reverse of the *Goodrich* question, namely whether state procedural law can *limit* the process due under Constitution and holding that the question of "what process is due" under the Fourteenth Amendment is a federal constitutional question that is not answered by state procedural law).

to support a due process claim. Rather, the minimum process she must be provided to satisfy the Due Process Clause is notice and a hearing before she is terminated. *See Loudermill,* 470 U.S. at 542, 546, 105 S.Ct. 1487. Clearly, plaintiff cannot allege that she has been denied such process, as she has not yet been terminated.[8] Accordingly, plaintiff's due process property interest claim must be dismissed.

### B. Fourteenth Amendment Due Process—Liberty Interest

■■■ Plaintiff's parallel claim under the Fourteenth Amendment—that she has been deprived of her liberty interest in her good name and reputation—must likewise be dismissed. It is well established that employees have a constitutionally protected liberty interest in their "good name, reputation, honor or integrity," and that this liberty interest "is implicated by public announcement of reasons for an employee's discharge." *Johnson v. Morris,* 903 F.2d 996, 999 (4th Cir.1990); *see also Roth,* 408 U.S. at 573, 92 S.Ct. 2701 (holding that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential"). In order to state a claim for violation of the liberty interest in her good name and reputation, plaintiff must allege facts sufficient to show (i) that "[her] superiors made charges against her that 'might seriously damage [her] standing and associations in [her] community' or otherwise 'imposed on [her] a stigma or other disability that foreclosed [her] free-dom to take advantage of other employment opportunities,'" (ii) that the charges were made public by the employer, (iii) that the charges were false, and (iv) that the stigmatizing remarks were "made in the context of a discharge or significant demotion." *Stone,* 855 F.2d at 172 n. 5 (citing *Roth,* 408 U.S. at 573–75, 92 S.Ct. 2701; *Bishop v. Wood,* 426 U.S. 341, 348–49, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *Paul v. Davis,* 424 U.S. 693, 710–11, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). Plaintiff has failed to allege facts sufficient to show the second and fourth elements.

■■■ First, nothing in the complaint indicates that there has been any publication of the allegedly false criticism of her work performance and character. Plaintiff does not allege that defendants' allegedly stigmatizing statements or reports have been made public in any way; rather, the allegations in the complaint refer to statements and comments made only in internal memoranda, during private conversations, and at meetings not attended by the public. *Cf. Johnson,* 903 F.2d at 998 (noting that the reasons for plaintiff's demotion were published in local newspapers). Since the allegedly stigmatizing statements were not "made public," they "cannot properly form the basis for a claim that [plaintiff's] interest in [her] 'good name, reputation, honor or integrity' was thereby impaired." *See Bishop,* 426 U.S. at 348, 96 S.Ct. 2074. Nor can the exposure of these statements "in the course of

---

**8.** Plaintiff relies on language in *Loudermill* requiring that "an individual must be given an opportunity for a hearing *before* he is deprived of any significant property interest" to support her claim that due process requires a hearing at the point where an employee is threatened with termination but not yet terminated. *Id.* at 542, 105 S.Ct. 1487. Yet, plaintiff simply cannot allege that defendants have failed to provide her a pre-termination hearing when she has not yet been terminated. In the event defendants decide at some future point that plaintiff ought to be terminated, they may then provide her the constitutionally required pre-termination hearing. If plaintiff is terminated without such a hearing, she may then have a Fourteenth Amendment claim.

a judicial proceeding which did not commence until after [plaintiff] had suffered the injury for which [she] seeks redress ... provide retroactive support for [her] claim." *Id.* In short, plaintiff has failed to allege that the false statements were published, and thus cannot state a claim for denial of her liberty interest without due process.[9]

 Second, plaintiff has not asserted any facts indicating that the allegedly stigmatizing statements were made in the context of a "discharge or significant demotion." *Stone,* 855 F.2d at 172 n. 5. As the Fourth Circuit noted in *Johnson,* "[p]ublication of stigmatizing charges alone, without damage to 'tangible interests such as employment,' does not invoke the due process clause." *Johnson,* 903 F.2d at 999 (citing *Paul,* 424 U.S. at 701, 96 S.Ct. 1155). Rather, there must be "some damage to [plaintiff's] employment status." *Id.* The facts as alleged in the complaint indicate that plaintiff has not been discharged nor demoted; she remains employed in the same position as a school psychologist in the LCPS. At most, plaintiff has suffered some minor restriction of her freedom and authority as a result of her placement on probation and the increased supervision of her activities. This falls well short of a "significant demotion," and thus, even were the allegedly false statements made public by defen-dants, plaintiff has not stated a claim for violation of due process with regard to her liberty interest. *See Stone,* 855 F.2d at 172 n. 5.

Accordingly, given plaintiff's failure to allege facts sufficient to show either publication of the statements or that they were made in the context of a discharge or significant demotion, the claim asserting a deprivation of her liberty interest in her good name and reputation without the due process guaranteed by the Fourteenth Amendment must be dismissed.

### C. First Amendment retaliation

 Plaintiff also asserts a constitutional claim under the First Amendment, claiming that defendants took disciplinary action against her in retaliation for her criticism of the LCPS's special education policies. In order to make out a claim for First Amendment retaliation, plaintiff must show (i) that she engaged in speech on a matter of public concern, (ii) that the retaliatory action deprived her of some valuable benefit, and (iii) that there is a causal connection between the protected action and the retaliatory speech, which would not have occurred "but for" the protected expression. *Holland v. Rimmer,* 25 F.3d 1251, 1254 (4th Cir.1994); *Huang,* 902 F.2d at 1140. As to the first element, in determining whether particular

9. Plaintiff contends that her personnel record contains false and stigmatizing information and that this information will be made available to any future employer, thereby limiting her prospects for future employment. Yet, the Fourth Circuit made clear in *Johnson* that an employee who has not been terminated is in a different situation from a terminated employee whose "opportunity for other gainful employment is thwarted by the publication of the reasons for his discharge." *Johnson,* 903 F.2d at 999 (citation omitted). In other words, an employee who has not been terminated "cannot complain that he has been made unemployable; he remains employed." *Id.,* citing *Hershinow v. Bonamarte,* 735 F.2d 264, 266 (7th Cir.1984). Surely, then, plaintiff cannot rely here on the *potential* future publication of the allegedly false and stigmatizing statements to future employers to state a due process claim. To hold otherwise would allow any employee with potentially damaging information in her personnel file to assert a federal constitutional claim. Common sense and precedent preclude such a result, for it is well established that "[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Bishop,* 426 U.S. at 349, 96 S.Ct. 2074.

speech is protected under the First Amendment, courts consider "(1) whether a public employee's speech qualifies as a matter of public concern, and (2) what effect the speech has on the efficiency, discipline, and proper administration of the workplace." *Holland,* 25 F.3d at 1254. To determine whether speech involves a matter of public concern, courts examine the "content, context, and form of the speech at issue in light of the entire record." *Urofsky v. Gilmore,* 216 F.3d 401, 406 (4th Cir.2000). Clearly, speech that does not relate to "any matter of political, social, or other concern to the community" is not of public concern. *Holland,* 25 F.3d at 1254. More specifically, an employee's speech is protected as a matter of public concern when the employee speaks "as a citizen upon matters of public concern," not when the employee speaks "as an employee upon matters only of personal interest." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

 Here, plaintiff alleges that she was retaliated against for her criticism of the LCPS's treatment of disabled students in the special education program and for her complaint that LCPS's special education policy did not comport with the ADA and the Rehabilitation Act. A school system's treatment of disabled students in a special education program and its compliance with federal law would appear at this juncture to be matters of public interest, not merely matters of personal inter-

est to plaintiff.[10] Moreover, the fact that plaintiff made her critical statements privately to her supervisors and co-workers, not to the public at large, does not render the speech not of public concern. *See McVey v. Stacy,* 157 F.3d 271, 279, 280 (4th Cir.1998) (panel opinion and Murnaghan, J., concurring) (holding that private protests may be protected speech); *Cromer v. Brown,* 88 F.3d 1315, 1326 (4th Cir. 1996) (same). Accordingly, plaintiff has alleged sufficient facts to state a claim that her criticism of the LCPS's special education policies was a matter of public concern.[11] Nor does it appear, under the facts as alleged by plaintiff, that her speech was disruptive of the efficiency, discipline or administration of the workplace. *See Holland,* 25 F.3d at 1254. Thus, plaintiff's allegations are sufficient to state a claim that her statements were protected under the First Amendment; indeed, defendants do not dispute this element in their motion to dismiss.

 With regard to the second element, the question is whether the retaliatory acts alleged by plaintiff deprived her of "some valuable benefit." Not every restriction or adverse action by an employer against an employee rises to the level of a constitutional violation. *See DiMeglio v. Haines,* 45 F.3d 790, 806 (4th Cir.1995). Instead, the dispositive question is, sensibly, "whether the adverse actions complained of, under the particular

10. To be sure, this issue may be revisited at trial or on summary judgment on the basis of the record as it develops. *See infra* n. 11.

11. This threshold determination that plaintiff has sufficiently stated a claim that her speech involved matters of public concern does not, of course, ultimately resolve the difficult and determinative question, not addressed by either party nor made clear in the complaint, whether plaintiff spoke in her role as a private citizen or in her role as a public employee. *See Urofsky,* 216 F.3d at 407–08 (holding that the determination whether the speech was made "primarily in the [employee's] role as citizen or primarily in his role as employee" is "critical," and providing examples of a public employee acting in each role). This determination requires a consideration of the "content, context, and form" of plaintiff's speech, *id.* at 406, details not provided in plaintiff's allegations. Because the determination is highly factual and contextual, a decision on this issue must await a more complete record, either on summary judgment or at trial.

circumstances of the case, would deter the employee from again exercising his constitutional right to publicly comment on matters of public concern." *Saleh v. Upadhyay,* 11 Fed.Appx. 241, 255–56 (4th Cir.2001) (unpublished *per curiam* opinion) (citing *ACLU of Md. v. Wicomico Cty.,* 999 F.2d 780, 784 (4th Cir.1993) (holding that "retaliatory actions may tend to chill individuals' exercise of constitutional rights")). Although dismissal is clearly sufficient under this test, the action need not be "the substantial equivalent of a dismissal," and "failure to rehire, a denial of promotion, or a denial of transfer, may constitute a deprivation of a valuable government benefit." *DiMeglio,* 45 F.3d at 806 (citing *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 73–76, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)). And indeed, something less onerous than an adverse employment action in the context of Title VII may be sufficient, because the key is whether the adverse action would operate to chill or deter speech on a matter of public concern. *Saleh,* 11 Fed.Appx. at 255.

■■■ Of particular relevance here is that a public employer is "prohibited from threatening to discharge a public employee in an effort to chill that employee's rights under the First Amendment." *Edwards v. City of Goldsboro,* 178 F.3d 231, 246 (4th Cir.1999); *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (same). Thus, a threat to terminate, without any accompanying actual loss of a valuable job benefit, is sufficient to satisfy the second element of a First Amendment claim. This is so because a "threat of dismissal from public employment is a potent means of inhibiting speech." *Id.,* quoting *Rankin,* 483 U.S. at 384, 107 S.Ct. 2891. A retaliatory threat

to terminate an employee because of protected speech is actionable as a constitutional violation even absent a showing that it has been carried out; for in precisely those situations the employer may have successfully "chilled" his employees' free speech rights.

From this, it follows that plaintiff has stated a viable First Amendment retaliation claim, as she has alleged in the complaint that defendants threatened to terminate her employment contract. Specifically, plaintiff alleges that she was placed on the evaluation cycle in September of 2002 and that she was subsequently given an "unsatisfactory" rating and placed on the "December List," which served as notice that her contract might not be renewed the following year. Most significantly, in January 2003, plaintiff alleges that she was presented with resignation papers and informed that if her rating remained "unsatisfactory" in March, her supervisor "will be recommending" that her contract not be renewed.[12] Clearly, such actions, provided they were caused by plaintiff's criticism of the special education policies, as she alleges, "may tend to chill [her] exercise of constitutional rights." *ACLU,* 999 F.2d at 785. Thus, the fact that plaintiff remains employed by the LCPS and has not actually been terminated is not fatal to her First Amendment retaliation claim as it is to her claims under the Fourteenth Amendment.

■■■ Finally, plaintiff must allege sufficient facts to show a causal relation between her protected speech concerning the special education policies and defendants' actions in threatening to terminate her contract. *See Huang,* 902 F.2d at 1140. This causation requirement is "rigorous" in

---

**12.** This statement was later corrected by a letter indicating that her supervisor "may be

recommending" termination in that event.

that a "claimant must show that 'but for' the protected expression the employer would not have taken the alleged retaliatory action." *Id.*

Here, plaintiff does not allege that defendants ever explicitly linked the termination threat to her protected speech. *Cf. Edwards*, 178 F.3d at 239, 248 (holding that where the plaintiff was explicitly threatened with termination if he continued to teach a concealed handgun safety course, the complaint left "no doubt" that the threat "was intended to chill his right to engage in . . . protected expression"). Yet, neither does plaintiff merely assert, without more, that the threat was retaliatory. *Cf. Huang*, 902 F.2d at 1141 (dismissing a retaliation claim on summary judgment where there was "not a scintilla of evidence that [the decision to transfer plaintiff] was infected with a retaliatory motive traceable" to plaintiff's protected speech.) In this regard, the timing of the incidents may support an inference of a retaliatory motive, as the alleged retaliatory acts commenced at the same time as her criticism of the policies. According to the complaint, the retaliatory actions began in September 2001, when defendant Holmes launched the allegedly unfounded investigation into plaintiff's supposed "absenteeism" after a single instance of tardi-

ness, shortly after she began criticizing his changes to special education policies. Moreover, under the facts as alleged, defendant Holmes, who appears to have borne the brunt of plaintiff's criticism, is the driving force behind the retaliatory actions. Further support for an inference of causation is furnished by plaintiff's allegations in the complaint that the defendants' grounds for the actions taken against her are pretextual. In this regard, plaintiff alleges (i) that her supervisors ignored positive comments from co-workers in giving her an unsatisfactory rating, (ii) that they did not conduct thorough investigations and did not interview her co-workers before taking action against her, and (iii) that her co-workers can vouch for the fact that many of the criticisms of her performance were false. In short, while the parties may vigorously dispute the factual causation question, plaintiff has sufficiently stated a claim on this element to survive a motion to dismiss.

 Accordingly, plaintiff has alleged sufficient facts to state a First Amendment retaliation violation, and therefore her First Amendment claim, unlike her Fourteenth Amendment claims, survives defendants' motion to dismiss.[13]

---

**13.** Defendants assert a defense of qualified immunity against the First Amendment retaliation charge. Qualified immunity protects government officials performing discretionary duties from civil suit so long as the officials' conduct does not violate clearly established statutory or constitutional rights. *McVey v. Stacy*, 157 F.3d 271, 276 (4th Cir.1998). Thus, to overcome defendants' claim to qualified immunity, plaintiff must claim a violation of a right pursuant to a statute or the Constitution which is "clearly established so that an objectively, reasonable officer would have known of it." *Id.* The fact that a threat of termination can constitute actionable First Amendment retaliation is clearly established. *See Edwards*, 178 F.3d at 246; *Rankin*, 483 U.S. at 383, 107 S.Ct. 2891. Yet, the deter-

mination that plaintiff's speech is constitutionally protected requires a sophisticated balancing of interests, and thus will "only infrequently" be clearly established. *McVey*, 157 F.3d at 277. And, as the record is not yet sufficiently developed to determine whether plaintiff's interests were clearly outweighed by defendants', the qualified immunity determination must be deferred until a more complete record is developed. *See id.* at 279 (affirming the district court's deferral of the qualified immunity issue). Yet, because qualified immunity is properly addressed as soon as possible, defendants should move promptly in the event the record, as it develops, supports a finding of qualified immunity.

### D. Defamation

■■■■■■ Alongside plaintiff's § 1983 constitutional tort claims, she also asserts a claim of defamation under Virginia state law. Under Virginia law, to state a claim for defamation, plaintiff must show (1) publication, (2) of an actionable statement with (3) the requisite intent. *Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir.1993). To be "actionable," the statement must not only be false, but defamatory, that is, it must "tend[ ] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* In other words, "[m]erely offensive or unpleasant statements" are not defamatory; rather, defamatory statements "are those that make the plaintiff appear odious, infamous, or ridiculous." *Id.* (citation omitted). Furthermore, "speech which does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action." *Yeagle v. Collegiate Times*, 255 Va. 293, 295, 497 S.E.2d 136 (1998). Such speech is sometimes referred to as "pure expressions of opinion." *Id.* at 295 n. 1, 497 S.E.2d 136. A statement is defamatory *per se* if it (i) imputes the commission of a crime of moral turpitude for which a party may be convicted, (ii) imputes that the person is infected with a contagious disease which would exclude the person from society, (iii) imputes an unfitness to perform the duties of a job or lack of integrity in the performance of duties, or (iv) prejudices the party in her profession or trade. *Id.* at 297 n. 2, 497 S.E.2d 136, citing *Fleming v. Moore*, 221 Va. 884, 889, 275 S.E.2d 632 (1981). And significantly, under Virginia law, whether a statement is actionable as defamatory and whether it is defamatory *per se* are matters of law for the trial judge to determine.

*Id.* at 296, 497 S.E.2d 136; *Chapin*, 993 F.2d at 1092.

■■■■■■ The publication requirement for defamation requires a dissemination of the statement to a third party where that dissemination does not occur in a privileged context. *See Montgomery Ward & Co. v. Nance*, 165 Va. 363, 379, 182 S.E. 264 (1935). In this regard, it is well settled under Virginia law that "[c]ommunications between persons on a subject in which the persons have an interest or duty are occasions of privilege," and that "statements made between co-employees and employers in the course of employee disciplinary or discharge matters are privileged." *Larimore v. Blaylock*, 259 Va. 568, 572, 528 S.E.2d 119 (2000); *see also Southeastern Tidewater Opportunity Project, Inc. v. Bade*, 246 Va. 273, 275, 435 S.E.2d 131 (1993) (holding that a letter was privileged because it "was written in the context of his employment relationship"). Thus, the privilege applies broadly to all statements related to "employment matters," provided the parties to the communication have a duty or interest in the subject matter. *Larimore*, 259 Va. at 574–75, 528 S.E.2d 119. And, employees have a general duty "to inform management of adverse or improper actions by fellow employees," just as management has a duty "to investigate and make decisions regarding matters of continued employment." *Id.* at 575, 528 S.E.2d 119. Accordingly, neither party disputes that the relevant statements in this case are privileged.

■■■■■■ It is also settled that this privilege is qualified and is lost "if a plaintiff proves by clear and convincing evidence that the defamatory words were spoken with common-law malice." *Southeastern Tidewater*, 246 Va. at 276, 435 S.E.2d 131; *see also Larimore*, 259 Va. at 572, 528 S.E.2d 119. Common-law malice, in turn, is "behavior actuated by motives of personal spite, or ill-will, independent of the occa-

sion on which the communication was made." *Southeastern Tidewater*, 246 Va. at 276, 435 S.E.2d 131. In other words, to avoid the qualified privilege plaintiff must show that "the communication was actuated by some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff." *Id.* Thus, in order to state a claim for defamation, plaintiff must allege facts sufficient ultimately to support a finding by clear and convincing evidence that the statements of her supervisors and co-workers were made with actual, common-law malice. *Id.* at 275–76, 435 S.E.2d 131.

 In considering whether this complaint meets that burden, it must first be noted that plaintiff's repeated assertions that each defendant charged with defamation acted "with malice" and with a "motive of personal spite and revenge" are not, by themselves, sufficient to state a claim of malice sufficient to overcome the qualified privilege. Although the facts as alleged in the complaint must be taken as true for the purpose of this motion to dismiss, such conclusory allegations do not state a claim for malice if the facts as alleged cannot otherwise support a finding of malice. *See Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir.2001) (holding that plaintiff does not state a claim requiring "deliberate indifference" merely by "throw[ing] in words and phrases such as 'deliberate indifference,' 'malicious,' 'outrageous,' and 'wanton' when describing the conduct"). Likewise, the allegations in the complaint that the defendants charged with defamation made the allegedly false statements with the intention of advancing their careers and currying favor with their supervisors also fall short of stating a claim of actual malice. After all, any time an employee reports misconduct by a co-worker one might say that the employee acted maliciously in trying to curry favor with supervisors at the expense of a co-worker. Were such bare allegations sufficient to

state a claim of malice, virtually every claim of defamation based on a co-worker's report of misconduct would survive a motion to dismiss. Neither precedent nor common sense approve of such a result. *See Larimore*, 259 Va. at 575, 528 S.E.2d 119 (noting that employees have a duty "generally to inform management of adverse or improper actions by fellow employees" and that the qualified privilege rule serves "to encourage open communications on matters of employment").

Nonetheless, plaintiff's complaint contains more than these bare, insufficient allegations; it sufficiently states a claim of malice, insofar as it alleges a general pattern of retaliation against plaintiff and a larger conspiracy among the defendants to discredit plaintiff through false statements and unfounded disciplinary actions. More specifically, the complaint asserts that Holmes, in his campaign to retaliate against plaintiff, created an atmosphere which encouraged the collection of false and defamatory statements that could be used as evidence against plaintiff. The complaint further alleges that plaintiff's supervisors Weisman and Lody, and her co-workers Trenary, Sakati, and Rehm, came forward with false statements against plaintiff in response to Holmes's encouragement and thus joined in the retaliatory campaign. Accordingly, to the extent plaintiff ultimately shows that the defendants who made the allegedly defamatory remarks were aware of and part of a joint effort to discredit her and retaliate against her, plaintiff will be able to show the defendants acted with the required "sinister or corrupt motive." *Southeastern Tidewater*, 246 Va. at 276, 435 S.E.2d 131.

In this regard, the existence of this conspiracy to retaliate is stated with some detail in the complaint, as it is the heart of plaintiff's complaint and the basis for the surviving First Amendment claim. Less

clear, however, is the extent to which each individual defendant was aware of, and a participant in, such a scheme. Thus, to provide clear and convincing proof of malice, plaintiff will have to come forward with far greater evidentiary detail supporting a finding of malice on the part of each individual alleged to have defamed plaintiff than is included in her complaint. *See, e.g., Oberbroeckling,* 234 Va. at 379–82, 362 S.E.2d 682 (affirming a jury's finding of malice where (i) the record showed that plaintiff's prior record was exemplary, (ii) that the defaming defendant took over plaintiff's job, (iii) that the defamatory charges against plaintiff were discredited and plaintiff was offered his job back, and (iv) that the defaming defendant was overheard saying that plaintiff "was a lying, cheating, SOB; that he ... got; that he crucified him; and he tacked him to the wall").

 As plaintiff, at least at this stage, has stated sufficient facts to survive a motion to dismiss with regard to the existence of malice, it is next necessary to consider the individual statements alleged to be defamatory and to determine, as a matter of a law, whether they are actionable. *Yeagle v. Collegiate Times,* 255 Va. at 296, 497 S.E.2d 136. On a motion to dismiss a defamation claim, a court must credit plaintiff's allegations that the statements were factually false, and focus instead on whether the alleged statements could support a finding that they are actionable. *See Chapin,* 993 F.2d at 1092. Many of the statements plaintiff alleges were defamatory simply do not rise to the level of actionable defamation under Virginia law, even assuming the statements

were false as plaintiff asserts. In this regard, criticism of plaintiff's job performance or manner, even if clearly damaging to the plaintiff's interests, does not necessarily constitute actionable defamation; instead, the alleged statements must be measured against the Virginia law standards for defamation that require that a statement either fit within a specific category of defamation *per se* or be sufficiently severe to meet the general defamation standard.[14]

 The following statements do not rise to the level of actionable defamation because they are not defamatory *per se,* as they cannot be construed to imply that plaintiff is unfit for or lacks integrity in performing her duties or to prejudice plaintiff in her profession, nor are they severe enough to make plaintiff appear odious, infamous, or ridiculous under the general defamation standard:

(i) Trenary's statement that plaintiff presented a counseling model with which the staff was not comfortable, ¶¶ 86(a)(1) & (2),

(ii) Sakati's statement that plaintiff behaved inappropriately during a student-counseling group by "insulting" and "contradicting" her, ¶ 86(b)(1),

(iii) Sakati and Rehm's statements that plaintiff was inept at handling a situation involving two disabled students returning to a classroom, ¶¶ 86(b)(3) & (c)(1),

(iv) Weisman and Lody's statement that plaintiff must continue to become more accepting of others' opinions and that many colleagues perceive her as manipulative and defensive, ¶¶ 86(d)(6),

**14.** *Compare Chaves,* 230 Va. at 118–19, 335 S.E.2d 97 (holding that statements that an architect was "inexperienced" and his fees were "excessive" are mere statements of opinion and do not impute unfitness to perform the duties of his employment) *with Oberbroeckling v. Lyle,* 234 Va. 373, 379, 362 S.E.2d 682 (1987) (holding that a memorandum accusing plaintiff of "mismanagement of funds" was defamatory because it implied that plaintiff was unfit to perform the duties of his employment or lacked integrity or was dishonest in performing them).

(v) Weisman's statement that plaintiff needs to develop greater sensitivity to the reactions of others and to monitor her behavior, ¶ 86(e)(2), and

(vi) Lody's statement that plaintiff has difficulty in her relationship with her colleagues, ¶ 86(f)(1).

Even assuming that these statements are provably false, rather than pure expressions of opinion, they do not sufficiently impugn plaintiff's abilities or character to suggest that she is unfit for her job, nor do they question her integrity. *See Chapin,* 993 F.2d at 1092; *Yeagle,* 255 Va. at 297 n. 2, 497 S.E.2d 136.

■ By contrast, the following alleged statements could be construed either to imply or to state directly that plaintiff lacks integrity or is unfit for her profession:

(i) Trenary's statement that plaintiff was abrasive, unprofessional, and rude, which implies that she is unfit for her position as a school psychologist, ¶ 86(a)(3),

(ii) Trenary's statement that plaintiff altered a permission form after being told not to, which implies that she lacks integrity in performing her duties, ¶ 86(a)(4),

(iii) Sakati's statement that plaintiff misinterprets a lot and lies, which implies that she lacks integrity in performing her duties, ¶ 86(b)(2),

(iv) Weisman and Lody's statements that plaintiff fails to meet professional standards and that her "overall performance remains in need of improvement," and, more specifically, that she failed to maintain an adequate line of communication with other staff members, struggled to submit reports in a timely manner, failed to provide requested information and complete evaluation components, failed to follow established departmental practices, and that she was abrasive and insulting to other committee members, which imply that plaintiff is unfit to perform her duties, ¶¶ 86(d)(1), (2), (4), (7) & (8),

(v) Weisman and Lody's statements that plaintiff failed on a certain occasion to obtain parental permission before conducting an evaluation and that plaintiff, on another occasion, altered a permission form because she did not agree with the policy, which imply that plaintiff lacks integrity in performing her duties, ¶¶ 86(d)(3) & (5), 86(e)(3) & (4), and

(vi) Weisman's statement that plaintiff's behavior is unprofessional and in need of corrective action, which implies that plaintiff is unfit to perform her duties, ¶ 86(e)(1).

Accordingly, plaintiff has alleged sufficient facts to support a defamation claim against defendants Trenary, Sakati, Weisman, and Lody, but not against defendant Rehm. Thus, the motion to dismiss must be granted with respect to defendant Rehm, but denied with respect to the remaining four defendants charged with defamation.[15]

---

**15.** Of course, this threshhold conclusion that plaintiff's allegations are sufficient to state a claim for defamation against four defendants is far from a conclusion that the alleged statements are, in fact, defamatory. Not only must plaintiff establish that the statements were false, she must also provide further evidence regarding the actual content and context of the statements to show that the statements are, in fact, actionable as defamatory. *See Chapin,* 993 F.2d at 1092. For example,

Trenary's assertion that plaintiff acted "unprofessionally" may or may not constitute an actionable defamatory statement, depending on the nature and severity of the charge of "unprofessionalism." After all, there is a wide range of behavior reasonably labeled "unprofessional," that could be as minor as chewing gum during a meeting or as serious as ridiculing or disparaging the students for whom she cares. The complaint provides little of the

## III.

In sum, plaintiff's property interest and liberty interest claims under the Due Process Clause of the Fourteenth Amendment must be dismissed, as she has not alleged the deprivation of a property interest or liberty interest sufficient to invoke the protections of the Due Process Clause. Under these circumstances, the fact that plaintiff has not been terminated, but remains employed by LCPS is fatal to her due process claims. By contrast, plaintiff has stated a claim for First Amendment retaliation, even though no concrete adverse action such as termination has been taken against her. Here, the clear threat of termination is sufficient to chill her exercise of her First Amendment rights and this, under the law, justifies federal constitutional review of the defendants actions to ensure that they have not violated plaintiff's First Amendment rights. Finally, plaintiff has stated a claim for defamation against Trenary, Sakati, Weisman, and Lody, although she must yet provide significant additional evidentiary detail to prevail ultimately on this claim. Plaintiff's claim against defendant Rehm must be dismissed.

An appropriate order will issue.

necessary detail regarding the context and exact content of the allegedly defamatory statements. In sum, plaintiff has yet many hurdles to overcome at the summary judgment and trial stages before she can prevail on this claim.