Ashutosh Ron VIRMANI, Md,
Plaintiff–Appellee,

v.

NOVANT HEALTH INCORPORATED, formerly known as Presbyterian Health Services Corporation, Defendant–Appellant.

North Carolina Medical Society; North Carolina Hospital Association; American Medical Association; American Hospital Association; American Association of Physicians of Indian Origin; American College of International Physicians; National Medical Association; Charlotte Medical Society; North Carolina Association of Physicians of Indian Origin; Old North State Medical Society, Amici Curiae.

No. 00–2423.

United States Court of Appeals,
Fourth Circuit.

Argued April 5, 2001.

Decided Aug. 1, 2001.

**ARGUED:** Lawrence Carlton Moore, III, Robinson, Bradshaw & Hinson, P.A., Charlotte, NC, for Appellant. James Clayton Culotta, Law Office of Kenneth Joel Haber, P.C., Rockville, MD, for Appellee. **ON BRIEF:** Everett J. Bowman, Louis A. Bledsoe, III, Robinson, Bradshaw & Hinson, P.A., Charlotte, NC, for Appellant. Kenneth J. Haber, Charles E. Hamilton, III, Law Office of Kenneth Joel Haber, P.C., Rockville, MD, for Appellee. Julian D. Bobbitt, Jr., Sean A. Timmons, Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., Raleigh, NC, for Amici Curiae Medical Society, et al. Normand F. Pizza, Carin A. Kramer, Milling, Benson, Woodward, L.L.P., New Orleans, LA, for Amici Curiae Association of Physicians, et al.

Before WIDENER and LUTTIG, Circuit Judges, and REBECCA BEACH SMITH, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge SMITH wrote the opinion, in which Judge WIDENER and Judge LUTTIG joined.

## OPINION

SMITH, District Judge:

Novant Health, Incorporated ("Novant") appeals an order of the district court denying its motion for protective order and granting in part Dr. Ashutosh Ron Virmani's motion to compel records related to medical peer reviews. Novant argues that the documents Virmani seeks to discover are privileged. Because we decline to recognize a privilege for medical peer review materials, we affirm the order of the district court.

### I.

Dr. Virmani is an obstetrician-gynecologist who was granted medical staff membership and clinical privileges at Presbyterian Hospital and Presbyterian Hospital Matthews (collectively, "Presbyterian").[1] During a laparoscopic procedure in 1994 at Presbyterian Hospital, Virmani inadvertently punctured the iliac artery of a patient, creating a life-threatening emergency. Virmani states that this is a known possible complication of the procedure. Following a lengthy series of proceedings, Presbyterian suspended Virmani's staff membership and clinical privileges.

The first review (the "First Peer Review"), conducted by Presbyterian's OB/GYN Committee, lasted five months, from March through August of 1995. The Committee reviewed all cases in which Virmani had been the primary care physician since August of 1993 and found 24 of the 102 cases to be problematic. Based on the Committee's report, Novant suspended Virmani's privileges, pending a review by Presbyterian's Medical Board. At Virmani's request, the Hearing Committee of the Medical Board, which is composed of three physicians, conducted a full hearing on November 21, 1995. Following that hearing, the Medical Board voted to terminate Virmani's medical staff privileges. Presbyterian's Board of Trustee's upheld that decision on January 19, 1996.

On January 22, 1996, Virmani filed an action against Novant in North Carolina state court, alleging that the manner in which Presbyterian had suspended Virmani's privileges breached its bylaws. The trial court ordered Novant to give Virmani a new peer review proceeding, to be conducted by a peer review body composed of physicians from outside Presbyterian. In August of 1997, the North Carolina Court of Appeals affirmed the trial court's order to the extent it required a second peer review, but reversed as to the requirement that the second peer review body consist of an external committee. *See Virmani v. Presbyterian Health Servs. Corp.*, 127 N.C.App. 71, 488 S.E.2d 284, 289 (1997). Presbyterian then began a second internal peer review (the "Second Peer Review"), using a committee composed of members different from those who had conducted the First Peer Review. As a result of the Second Peer Review, the Medical Board and the Board of Trustees again decided to terminate Virmani's staff privileges.

Virmani filed the instant action in federal court on January 15, 1999, alleging that the termination of his privileges constituted discrimination against him on the basis of his race and national origin, in violation

---

1. The hospitals are non-parties that are subsidiaries of Novant, formerly known as Presbyterian Health Services Corporation.

of 42 U.S.C.A. §§ 1981, 1985 (West 1994). He claims that the hospital performed its medical peer review functions in a discriminatory manner, treating non-Indian physicians differently and disciplining them less harshly. Virmani also asserted state law claims for intentional infliction of emotional distress and negligent infliction of emotional distress.

During discovery, Virmani sought to obtain, *inter alia,* all peer review records related to all reviews of physicians for any reason, during the twenty years preceding his request. Novant moved for a protective order, arguing that the peer review materials were privileged under North Carolina law, *see* N.C. Gen.Stat. § 131E–95(b) (1999), and pursuant to Federal Rule of Evidence 501. Virmani filed a motion to compel production of the materials.

The district court[2] refused to recognize a privilege for medical peer review materials and, in its order filed June 27, 2000, denied Novant's motion for protective order. The court agreed with Novant, however, that the scope of Virmani's discovery requests was overly broad. Accordingly, in its June 27, 2000, order, the court granted in part and denied in part Virmani's motion to compel. Specifically, the court ordered production of "documents pertain-

ing to competency reviews of OB–GYN's from 1982 through 1997." J.A. 206.

On August 15, 2000, the district court denied Novant's motion for reconsideration. The court certified its June 27, 2000, order for interlocutory appeal, and we granted Novant's petition for leave to appeal.

## II.

■ Novant argues on appeal that the district court erred in refusing to recognize a privilege for documents related to medical peer review proceedings. Federal Rule of Evidence 501, which governs privileges in federal courts, provides that

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Fed.R.Evid. 501.[3] Whether to recognize a privilege under Federal Rule of Evidence

---

**2.** The case was referred to Magistrate Judge McKnight, pursuant to 28 U.S.C.A. § 636(c)(2) (West 1993).

**3.** The rule continues: "However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law." Fed.R.Evid. 501. If North Carolina law supplied the rule of decision, the materials would be privileged. *See* N.C. Gen.Stat. § 131E–95(b) (providing that "[t]he proceedings of a medical review committee, the records and materials it produces and the materials it considers … shall not be subject to discovery or introduction into evidence in any civil ac-

tion against a hospital"). This case involves a federal question together with pendent state law claims, however, and the Supreme Court has not addressed the question of whether federal common law controls in such a situation. *See Jaffee v. Redmond,* 518 U.S. 1, 16 n. 15, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). We agree with our sister circuits that in a case involving both federal and state law claims, the federal law of privilege applies. *See Pearson v. Miller,* 211 F.3d 57, 66 (3d Cir.2000); *Hancock v. Dodson,* 958 F.2d 1367, 1373 (6th Cir.1992); *von Bulow v. von Bulow,* 811 F.2d 136, 141 (2d Cir.1987); *Memorial Hosp. v. Shadur,* 664 F.2d 1058, 1061 & n. 3 (7th Cir.1981) (per curiam).

501 is a mixed question of law and fact, which we review *de novo. See Carman v. McDonnell Douglas Corp.*, 114 F.3d 790, 793 n. 2 (8th Cir.1997).

Evidentiary privileges "are not lightly created," *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), because "privileges contravene the fundamental principle that the public ... has a right to every man's evidence," *University of Pa. v. EEOC*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (alteration in original) (internal quotation marks omitted). When considering whether to recognize a privilege, a court must begin with "the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule." *Jaffee v. Redmond*, 518 U.S. 1, 9, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (internal quotation marks omitted). Thus, in our determination of whether to recognize a new privilege, we must heed the Supreme Court's admonition that we should not "create and apply an evidentiary privilege unless it 'promotes sufficiently important interests to outweigh the need for probative evidence.'" *University of Pa.*, 493 U.S. at 189, 110 S.Ct. 577 (quoting *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)); *see also Pearson v. Miller*, 211 F.3d 57, 67 (3d Cir.2000) ("[F]ederal courts are to assess the appropriateness of new privileges as they arise in particular cases, but they are to conduct that assessment with a recognition that only the most compelling candidates will overcome the law's weighty dependence on the availability of relevant evidence.").

Novant argues that confidentiality is essential to the effectiveness of medical peer review committees. Some courts have found that if a privilege is not accorded to the documents considered and produced by these committees, physicians would be reluctant to serve on the committees or would be less candid in their evaluations if they did serve; as a result, the quality of health care would suffer. *See, e.g., HCA Health Servs. of Va., Inc. v. Levin*, 260 Va. 215, 530 S.E.2d 417, 420 (2000). The issue before us is whether the interest in promoting candor in medical peer review proceedings outweighs the need for probative evidence in a discrimination case.[4] This is

---

4. We emphasize that Novant seeks to prevent Virmani from discovering peer review documents for use in this case of alleged discrimination; patient confidentiality is not at issue here, nor is public disclosure of other confidential medical records. There is an important distinction between privilege and protection of documents, the former operating to shield the documents from production in the first instance, with the latter operating to preserve confidentiality when produced. An appropriate protective order can alleviate problems and concerns regarding both confidentiality and scope of the discovery material produced in a particular case. Indeed, in the district court's order of June 27, 2000, refusing to recognize a privilege for peer review materials, the court limited the scope of the discovery requests in terms of the time period covered and the medical specialty involved. Further, on September 12, 2000, a consent protective order was entered by the court, which order provided for the protection of confidential documents, and, in particular, restricted the use of the confidential documents to the instant action. A court likewise can protect the identities of third parties, i.e., the patients and the other physicians who were the subjects of prior peer reviews, as well as exclude or redact extraneous confidential medical information, through an appropriate order. *See Marrese v. American Acad. of Orthopaedic Surgeons*, 726 F.2d 1150, 1160 (7th Cir.1984) (en banc) (describing means by which immaterial confidential information could be protected, including *in camera* review of documents and redaction of the names of reviewers pending a showing of relevance), *rev'd on other grounds*, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *cf. Memorial Hosp. v. Shadur*, 664 F.2d 1058, 1063 n. 6 (7th Cir.

an issue of first impression in this Circuit.[5] Novant advances three arguments in support of recognizing such a privilege: (1) the reasons underlying the Supreme Court's decision in *Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), to recognize a "psychotherapist privilege" apply with equal or greater force to the privilege at issue here; (2) Congress favors a medical peer review privilege; and (3) precedent from other circuits favors granting the privilege. We consider each argument in turn.

### A.

Novant identifies the following reasons underlying the Supreme Court's decision in *Jaffee* to recognize a privilege for statements made by a patient to her therapist during counseling sessions: the privilege serves a compelling public end; rejection of the privilege would result in only a modest evidentiary benefit; and all fifty states and the District of Columbia have recognized the privilege. Novant argues that each of these reasons applies with equal or greater force in favor of recognizing a privilege for medical peer review materials in this case, where a physician has alleged that he was the victim of discrimination in the peer review process. We disagree.

The Court in *Jaffee* determined that the psychotherapist privilege would serve the private interest of protecting confidential communications between psychotherapist and patient and the public interest of "facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem." *Jaffee*, 518 U.S. at 11, 116 S.Ct. 1923. The

Court concluded that these "significant" interests out-weighed the "modest" evidentiary benefit that would be realized by denying the privilege. *Id.* In particular, the Court observed that "[w]ithout a privilege, much of the desirable evidence to which litigants such as petitioner seek access ... is unlikely to come into being. This unspoken 'evidence' will therefore serve no greater truth-seeking function than if it had been spoken and privileged." *Id.* at 12, 116 S.Ct. 1923.

Significantly, the issue of privilege arose in *Jaffee* in an entirely different context than that of this case, in which Virmani's claim of discrimination arises from the peer review process itself. Therefore, Novant's reliance on *Jaffee* is misplaced. In *Jaffee*, a police officer who had fatally shot a person was being sued by the decedent's estate for use of excessive force. The plaintiff sought notes from counseling sessions in which the police officer participated after the traumatic incident. *See id.* at 5, 116 S.Ct. 1923. The psychotherapy sessions did not form the basis of the underlying claim of excessive force. In contrast, Virmani has alleged that the peer review proceedings themselves were conducted in a discriminatory manner. The best evidence regarding whether Virmani was properly suspended for his medical actions, rather than improperly suspended due to his race and national origin, is to be found in the process by which the decision to suspend him was reached.

Our decision here is more properly guided by *University of Pennsylvania v. EEOC*, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). In that case, involving a professor who claimed she was de-

---

1981) (per curiam) (suggesting that a protective order providing for *in camera* review of requested material to determine its relevance would mitigate the costs of disclosure of non-privileged documents).

**5.** Relevant case law from the Fifth and Seventh Circuits is discussed *infra* Part II.C.

nied tenure because of racial and sexual discrimination, the Supreme Court was asked to "fashion a new privilege" that the University claimed was "necessary to protect the integrity of the peer review process, which in turn is central to the proper functioning of many colleges and universities." 493 U.S. at 189, 110 S.Ct. 577. The Court declined to create such a privilege because it determined that the costs associated with discrimination outweighed the costs that would ensue from the disclosure of peer review materials. *See id.* at 193, 110 S.Ct. 577.[6] The Court found the peer review materials to be especially relevant because the discrimination charge arose from the peer review proceedings themselves:

> "[C]onfidential material pertaining to other candidates for tenure in a similar time frame may demonstrate that persons with lesser qualifications were granted tenure or that some pattern of discrimination appears.... [T]he peer review material itself must be investigated to determine whether the evaluations are based in discrimination and whether they are reflected in the tenure decision."

*Id.* (quoting *EEOC v. Franklin & Marshall Coll.*, 775 F.2d 110, 116 (3d Cir.1985)) (second & third alterations in original); *see also Marshall v. Spectrum Med. Group,* 198 F.R.D. 1, 5 (D.Me.2000) (declining to recognize privilege in action brought under Americans with Disabilities Act, in part because the suit alleged abuse of the peer review process); *Holland v. Muscatine Gen. Hosp.,* 971 F.Supp. 385, 390 (S.D.Iowa 1997) (declining to recognize privilege in action brought under Title VII of the Civil Rights Act of 1964 and stating

that "[t]he adequacy of the peer review investigation itself is in issue").

■ We agree with Novant that the privilege it seeks would serve important interests. However, as is the case in the academic context, the evidentiary benefit that will be realized by refusing to grant a privilege for medical peer review materials in a discrimination case is potentially great. The evidence Virmani seeks is crucial to his attempt to establish that he has been the subject of disparate treatment on the basis of race and ethnicity. To prove his allegations of disparate treatment, Virmani must compare the proceedings in his case against those involving similarly situated physicians. The interest in facilitating the eradication of discrimination by providing perhaps the only evidence that can establish its occurrence outweighs the interest in promoting candor in the medical peer review process. *See, e.g., University of Pa.,* 493 U.S. at 193, 110 S.Ct. 577 ("[F]erreting out ... invidious discrimination is a great, if not compelling, governmental interest.").

Novant further asserts that, as in *Jaffee,* evidence of the type that discrimination plaintiffs such as Virmani seek will not come into being if there is no medical peer review privilege, because physicians will be reluctant to speak openly and, in particular, will refrain from making remarks that would constitute evidence of discrimination. The evidence that Virmani seeks, however, is not evidence in the form of a "smoking gun," but rather, evidence of disparate treatment on the basis of impermissible factors. Such evidence will not come into being in the peer review process only if such disparate treatment ceases to occur. Thus, unlike the situation in *Jaffee,*

---

6. Crucial to the Court's holding was its determination that Congress had balanced the relevant interests and had declined to create a privilege. *See University of Pa., 493 U.S. at* 189–93, 110 S.Ct. 577. We discuss Congress's treatment of a medical peer review privilege *infra* Part II.B.

where the Court concluded that inhibiting admissions against interest is inconsistent with the goals of psychotherapy, and thereby harmful to societal interests, here, inhibiting the existence of the evidence at issue is not inconsistent with the goals of medical peer review and is beneficial to societal interests.[7]

Novant calls to our attention the fact that all fifty states and the District of Columbia have recognized some form of medical peer review privilege. The Supreme Court stated in *Jaffee* that "the policy decisions of the States bear on the question whether federal courts should recognize a new privilege," and "the existence of a consensus among the States indicates that 'reason and experience' support recognition of the privilege." *Jaffee*, 518 U.S. at 12–13, 116 S.Ct. 1923. In this case, however, the decision to accord privileged status to peer review materials, in at least some states, appears to have been based on the policy decision that the interest in promoting candor among medical personnel outweighs the interest in providing access to evidence in medical malpractice actions. *See, e.g., Eubanks v. Ferrier,*

245 Ga. 763, 267 S.E.2d 230, 232 (1980) (construing the Georgia statute making medical peer review materials privileged and citing cases from other states); *see also Levin,* 530 S.E.2d at 420 (observing that the Virginia statute making peer review information privileged is codified in the medical malpractice chapter of the title on civil procedure). The Georgia Supreme Court, for example, stated, "Courts considering the question have held that the enactment of such statutes represents a proper legislative choice between the competing public concerns of fostering medical staff candor, on the one hand, and impairing medical malpractice plaintiffs' access to evidence, on the other hand." *Eubanks,* 267 S.E.2d at 232. Other reasons that have been advanced in support of the privilege include protecting committee members from defamation suits and a loss of referrals. *See, e.g., Baltimore Sun Co. v. University of Md. Med. Sys. Corp.,* 321 Md. 659, 584 A.2d 683, 686–87 (1991).[8] In contrast to a discrimination case, in which the plaintiff's claim arises out of the peer review proceedings, a plaintiff's claim in a medical malpractice case arises from ac-

---

**7.** Furthermore, the motivations of those seeking the privilege here differ from those in *Jaffee.* A patient in need of a psychotherapist would have a personal motivation to seek mental health treatment, which might be diminished in the absence of a privilege. A doctor called upon to serve on a medical peer review committee may have a sense of obligation to the public at large, in addition to a personal desire to maintain quality health care, which may overcome any reluctance to serve and be forthcoming on a peer review committee, even in the absence of a privilege. *See LeMasters v. Christ Hosp.,* 791 F.Supp. 188, 191 (S.D.Ohio 1991) ("[M]ost physicians feel an ethical duty to the profession and to the public to keep the standard of health care high.").

**8.** One commentator has characterized the need for confidentiality of medical peer review materials as follows:

A physician's qualifications, competence, and ethics all are called into question when a medical staff committee is requested to review his application for staff privileges, to determine the extent of his clinical privileges, or to assess the quality of his work. The nature of these activities suggests that committee participants may lose professional friends, as well as referrals, from physicians who receive unfavorable reviews. In addition, the committee members, and the hospital as well, may be exposed to costly litigation alleging defamation, the most common claim arising from committee activities.

Charles David Creech, Comment, *The Medical Review Committee Privilege: A Jurisdictional Survey,* 67 N.C. L.Rev. 179, 179 n. 4 (1988) (internal quotation marks omitted).

tions that occurred independently of the review proceedings. *See Memorial Hosp. v. Shadur*, 664 F.2d 1058, 1062 (7th Cir. 1981) (per curiam) ("To recognize hospital review or disciplinary proceedings as privileged in the context of a malpractice action will generally have little impact upon the plaintiff's ability to prove a meritorious claim. For the crucial issue in that type of case is not what occurred at the review proceeding, but whether the defendant was in fact negligent in his care and treatment of the plaintiff.").

There is no evidence that state legislatures considered the potential impact on discrimination cases of a privilege for medical peer review proceedings. Thus, the states' policy decisions, reflecting different concerns than those implicated here, do not inform the judgment of this court in this case. Weighing further against recognizing a privilege here is that, in contrast to a medical malpractice or defamation action, if a plaintiff succeeds in a discrimination case, he advances important public interests in addition to his personal interests. *Cf. id.* (refusing to recognize a privilege for medical disciplinary proceedings in an antitrust case and observing that if the plaintiff was successful in proving his claim, he would "vindicate not only his own right to practice medicine ..., but also the strong public interest in open and fair competition which is embodied in the Sherman Act under which the case arises").

### B.

We should not recognize a privilege "where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself." *University of Pa.*, 493 U.S. at 189, 110 S.Ct. 577. The district court below found

that Congress had considered and rejected a privilege for medical peer review materials when it enacted the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C.A. §§ 11101–11152 (West 1995).[9] Novant argues that this finding is in error, and that, to the contrary, Congress favors a medical review privilege.

Although we cannot conclude that Congress actually considered and rejected a privilege for medical review materials when enacting the HCQIA, it is clear that Congress considered the relevant competing interests—providing incentive and protection to physicians who would serve on review committees versus allowing putative victims of discrimination to pursue their claims—and decided to give greater weight to the latter.

Congress's findings with respect to the HCQIA reflect its concern that medical malpractice and the need to improve the quality of medical care were national problems. *See* 42 U.S.C.A. § 11101(1). Congress determined that effective peer review would provide a remedy to these problems. *See id.* § 11101(3). However, "[t]he threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review." *Id.* § 11101(4). Thus, Congress concluded that "[t]here is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review." *Id.* § 11101(5). To provide this incentive and protection, Congress provided immunity from liability in damages to participants in the activities of professional review bodies meeting specified standards. *See id.* § 11111(a). However, Congress created an express exception to the immunity pro-

9. The court followed the reasoning of other district courts that had considered the issue and determined that Congress decided not to

establish a privilege for peer review documents. *See, e.g., Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 560 (S.D.N.Y.1996).

vision in the case of civil rights actions. *See id.* § 11111(a)(1) (providing that the exemption from liability in damages "shall not apply to damages under any law of the United States or any State relating to the civil rights of any person or persons, including the Civil Rights Act of 1964, 42 U.S.C.2000e, et seq. and the Civil Rights Acts, 42 U.S.C.1981, et seq."). Thus, insofar as Congress has considered the competing interests, it has not elevated the interest in encouraging peer review over the interest in combating discrimination.[10]

Novant contends that Congress favors a medical peer review privilege, as evidenced by the enactment of a privilege for the Department of Defense and the Department of Veterans Affairs. *See* 10 U.S.C.A. § 1102(a) (West 1998) (providing that "[m]edical quality assurance records created by or for the Department of Defense as part of a medical quality assurance program are confidential and privileged"); 38 U.S.C.A. § 5705(a) (West 1991) (providing that "[r]ecords and documents created by the Department [of Veterans Affairs] as part of a medical quality-assurance program ... are confidential and privileged"). However, these provisions also demonstrate that Congress will create a medical peer review privilege when it is so inclined.

### C.

Finally, Novant argues that recognition of the privilege is supported by cases from the Fifth and Seventh Circuits. In fact, the Seventh Circuit expressly declined to recognize a medical peer review privilege in *Memorial Hospital v. Shadur*, 664 F.2d 1058, 1063 (7th Cir.1981) (per curiam) (rejecting the privilege in a civil antitrust action and stating that "[t]he public interest in private enforcement of federal antitrust law in this context is simply too strong to permit the exclusion of relevant and possibly crucial evidence by application of the Hospital's privilege").

Novant argues that the holding in *Shadur* was subsequently undermined by the Seventh Circuit in *Marrese v. American Academy of Orthopaedic Surgeons*, 726 F.2d 1150 (7th Cir.1984) (en banc), *rev'd on other grounds*, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). In *Marrese*, however, the Seventh Circuit did not address the issue of whether medical peer review documents should be privileged. Indeed, rebuffing a First Amendment argument raised by the party seeking to withhold documents, the court stated, "If [the argument is] meant to establish a complete immunity from pretrial discovery of these materials[,] the argument is untenable in light of [*Shadur* ], which rejected a claim of privilege for a hospital's records of disciplinary proceedings against staff physicians." 726 F.2d at 1159.[11]

The Fifth Circuit case cited by Novant does not support its position either. At

---

**10.** Novant argues that, despite the fact that Congress failed to enact a privilege, Congress intended to protect medical peer review materials. Novant observes that Representative Waxman, the main sponsor of the House bill, stated that the bill was not intended to override state shield laws "that restrict the type of evidence that may be introduced in lawsuits challenging a disciplinary action in the context of peer review." 132 Cong. Rec. 33,117 (1986). However, Representative Waxman also indicated that the bill was not intended to shield acts of discrimination. *See id.* at

30,766 ("Actions that violate civil rights laws ... will not be protected under this bill.").

**11.** While the Seventh Circuit did, as Novant claims, consider the underlying policy of protecting the files at issue in its review of the *district court's discovery order* and subsequent contempt order, the Seventh Circuit did not find that the interest in the confidentiality of the files was paramount. Rather, the court concluded that "there were various devices that the district judge could have used to reconcile the parties' competing needs." 726 F.2d at 1160. The court emphasized, in fact,

issue in *United States v. Harris Methodist Fort Worth,* 970 F.2d 94 (5th Cir.1992), was the reasonableness of an administrative search that the Department of Health and Human Services proposed to conduct of a hospital's records to determine if the hospital was in compliance with civil rights laws. *See* 970 F.2d at 96, 100 02. This case is, therefore, inapposite, since it involved the balancing of interests under the Fourth Amendment, not Federal Rule of Evidence 501.[12]

In summary, only the Seventh Circuit has squarely addressed the issue of whether peer review documents should be privileged in federal courts, and that court has declined to recognize the privilege.[13] We, too, decline to recognize such a privilege here.

## III.

We hold that the interest in obtaining probative evidence in an action for discrimination outweighs the interest that would be furthered by recognition of a privilege for medical peer review materials. Therefore, we decline to recognize such a privilege. Accordingly, the order of the district court is affirmed.

*AFFIRMED.*

that its holding was limited: "We do not hold that all files of all voluntary associations are sacrosanct; we do not even hold that the membership files of an association of medical professionals are sacrosanct. They are discoverable in appropriate circumstances, subject to appropriate safeguards." *Id.* at 1161.

12. Although the Fifth Circuit addressed the hospital's argument that the documents sought were privileged, this portion of the opinion is *dicta. See* 970 F.2d at 103 ("[B]ecause we affirm the district court's determination that the proposed search exceeded bounds of reasonableness, we need not define the scope of any applicable privilege.").

13. The district courts that have addressed the issue in discrimination cases have all rejected a medical peer review privilege. *See, e.g., Holland,* 971 F.Supp. at 389; *Johnson v.. Nyack Hosp.,* 169 F.R.D. 550, 561 (S.D.N.Y. 1996); *Robertson v. Neuromedical Ctr.,* 169 F.R.D. 80, 83–84 (M.D.La.1996); *LeMasters v. Christ Hosp.,* 791 F.Supp. 188, 191 (S.D.Ohio 1991). None of the cases cited by Novant that recognize the privilege involved discrimination claims.