W. Kelley **BRASWELL**, M.D., Plaintiff,

v.

**HAYWOOD REGIONAL MEDICAL CENTER; Harry Lipham, M.D.; Eric Reitz, M.D.; Debera Huderly, M.D.; Luis Munoz, M.D.; David Peterson, M.D.; Christopher Wenzel, M.D.; and Richard Steele, M.D.,** Defendants.

No. CIV. 1:04CV92.

United States District Court, W.D. North Carolina, Asheville Division.

Jan. 14, 2005.

complaint's allegations." *Eastern Shore Mkts., Inc. v. J.D. Assocs., Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir.2000). The Court should also "accept as true the facts set forth in exhibits attached to the complaint." *Jeffrey M. Brown Assocs., Inc. v. Rockville Cen. Inc.,* 7 Fed.Appx. 197, 202 (4th Cir.2001). However, in considering the motion to dismiss, the Court "need not accept the legal conclusions drawn from the facts [alleged in the complaint, or] ... accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., supra.*

John B. Meuser, Deborah N. Meyer, Allison E. Serafin, Meyer & Meuser, P.A., Raleigh, NC, for Plaintiff.

Allan R. Tarleton, Van Winkle, Buck, Wall, Starnes & Davis, P.A., Asheville, NC, for Defendants.

## MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on Defendants' motion to dismiss. For the reasons stated below, the motion is allowed in part and denied in part.

### I. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) "should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support [his] claim and would entitle [him] to relief." *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). "Because only the legal sufficiency of the complaint, and not the facts in support of it, are tested under a Rule 12(b)(6) motion, [the Court] assume[s] the truth of all the facts alleged in the complaint and the existence of any fact that can be proved, consistent with the

### II. FACTUAL AND PROCEDURAL HISTORY

Plaintiff, Dr. W. Kelley Braswell ("Plaintiff" or "Dr. Braswell") is a general surgeon licensed to practice medicine in the State of North Carolina. Plaintiff's Amended Complaint ["Amended Complaint"], filed June 21, 2004, ¶ 1. Plaintiff managed one of two surgical practices in Haywood County, North Carolina, affiliated with Defendant Haywood County Hospital ("Defendant Hospital" or "the Hospital") in September 2000. *Id.,* ¶ 9. Defendant Hospital is a medical center governed by a Hospital Authority pursuant to the Hospital Authorities Act, Part B, Chapter 113E of the General Statutes of North Carolina.[1] *Id.,* ¶ 2. Defendant Dr. Harry Lipham served as the Hospital's chief of staff and as a member of the Medical Executive Committee in 2003. *Id.,* ¶ 3. Defendants Dr. Eric Reitz, Dr. Debera Huderly, Dr. Luis Munoz, Dr. David Peterson, Dr. Christopher Wenzel, and Dr. Richard Steele, were members of the Hospital's Surgical Case Review Committee during the relevant period in 2003. *Id.,* ¶ 4.

---

**1.** By virtue of this, Plaintiff has properly alleged a deprivation by state action or under color of state law, required to sustain a claim under § 1983.

### 1) The Dispute over Prospective New Surgeons

In September 2000, Plaintiff began recruiting physicians for an opening in his practice. *Id.*, ¶ 9. The Hospital agreed to grant an income guarantee and moving expenses to the applicant selected by the Plaintiff. *Id.*, ¶¶ 9–10. Following this hire by Plaintiff, the other surgical practice in Haywood County also began recruiting an additional surgeon. *Id.*, ¶ 11. Plaintiff, believing the hiring of two additional surgeons affiliated with the Hospital would exceed North Carolina's surgeon population density recommendations, wrote a letter to the competitor's applicant sharing these concerns. *Id.*, ¶¶ 12–13. The applicant subsequently refused the competitor's offer of employment. *Id.*, ¶ 13.

Thereafter in early 2001, Plaintiff was called before the Hospital's Board of Commissioners and "chastised for 'meddling in Board recruiting activities.'" *Id.*, ¶ 14. Further, the Hospital withdrew its offer of financial incentives and guarantees to the applicant who had accepted a position with the Plaintiff's practice. *Id.*, ¶ 15. Plaintiff also alleges that Dr. Lipham, who became Chief of Staff in 2003 and whose wife was actively involved in the Hospital's recruiting process, became openly hostile to him following this incident. *Id.*, ¶ 16.

### 2) Hospital Moratorium on Gastric Bypass Surgeries

Following complications in a gastric bypass surgery procedure performed by the Plaintiff in December 2002, and at the request of Dr. Lipham, the Hospital issued a moratorium on all gastric bypass surgeries by all surgeons at the Hospital. *Id.*, ¶ 17. The Hospital also created an Ad Hoc Committee to review all gastric bypass surgeries which had been previously performed. *Id.*, ¶ 19.

After three days, the moratorium was lifted for two surgeons from the Hospital's other affiliated surgical practice while it was continued for the Plaintiff. *Id.*, ¶ 18. On January 4, 2003, the Plaintiff applied for reinstatement and provided the Hospital's Medical Executive Committee ("MEC") with a list of all gastric bypass surgeries he had performed in the prior 18 months. *Id.*, ¶ 20. Following a meeting and through a letter written by Dr. Lipham dated January 15, 2003, the MEC advised the Plaintiff that the moratorium prohibiting him from performing gastric bypass surgeries would continue. *Id.*, ¶ 22.

### 3) Hospital Review of all Plaintiff's Current Surgical Patients and the Summary Suspension of his Hospital Privileges

Dr. Lipham's January 15, 2003, letter also advised Plaintiff that a new Ad Hoc Committee would be created to review the care provided to all of the Plaintiff's current surgical patients. *Id.* On May 7, 2003, the Ad Hoc Committee reported to Dr. Lipham that it had identified two of Plaintiff's patients whose care by the Plaintiff were of concern to the Committee. *Id.*, ¶ 23. Dr. Lipham then referred one of these cases to the Surgical Review Committee for their review.[2] *Id.*

---

**2.** However, the Court notes that from the scope of the Surgical Review Committee's May 16, 2003, recommendation, it appears their review was much broader than a single patient's case. *See* Exhibit A, Letter from the Surgical Case Committee to Dr. Harry Lipham, dated May 16, 2003, *attached to* Amended Complaint; *see also Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir.1991) ("[Where there is a conflict] between the bare allegations of the complaint and any exhibit attached [to the complaint] pursuant to Rule 10(c)[,] ... the exhibit prevails.").

The Surgical Review Committee reviewed the patient's care; and by letter to Dr. Lipham, cited problems with the Plaintiff's pre-operative evaluations, handling of surgical procedures, poor chart documentation, lack of forthrightedness with patient's families, recent surgical complications involving healthy patients, and instances where the Plaintiff was unable to be located by nurses for extended periods of time when he was needed for a patient's care. Exhibit A, Letter from the Surgical Case Committee to Dr. Harry Lipham, dated May 16, 2003, *attached to* Amended Complaint, at 1–2. The letter then reviewed two specific cases and detailed the deficient care it found the Plaintiff to have provided. *Id.*, at 2. The Surgical Review Committee concluded that "whether this related to some type of mental deterioration, his recent health problems, over extension with his practice [in] Sylva, or simply burnout, ... [the Plaintiff's] care is inappropriate and far too high in number of cases to ignore," and recommended that Plaintiff's medical privileges be suspended. *Id.*, at 2–3.

Dr. Lipham reported the findings of the Surgical Review Committee to the MEC, and on May 21, 2003, the MEC recommended to the Hospital president, David Rice, that Plaintiff's medical privileges at the hospital be suspended. Amended Complaint, ¶ 30. By letter dated June 12, 2003, Rice informed the Plaintiff that his hospital privileges had been summarily suspended. *Id.*, ¶ 31; Exhibit C, *attached to* Amended Complaint.

#### 4) Reconsideration and Appeals

The MEC subsequently held a meeting to reconsider the summary suspension of the Plaintiff's privileges. *Id.*, ¶ 32. The Plaintiff was invited to attend the meeting and to discuss the Committee's concerns. *Id.* Plaintiff alleges that after he discussed the case of a specific patient he left the room believing the hearing was over; however, the MEC continued to discuss other concerns regarding the Plaintiff presented by the Ad Hoc Committee after Plaintiff left the meeting. *Id.* The MEC decided to uphold the summary suspension of Plaintiff's hospital privileges. *Id.*

The Plaintiff requested a hearing on the suspension of his privileges; on October 28, 2003, pursuant to the Hospital by-laws, a Fair Hearing Committee was convened for that purpose. *Id.*, ¶ 33–35. As a part of the review, the Fair Hearing Committee heard testimony on November 5, 2003, from Dr. Jesse Meredith, who opined that the Plaintiff has used "good surgical judgment" and those who had participated in the decision to suspend the Plaintiff "were 'not knowledgeable about the issues.'" Exhibit B, Transcript of Proceedings, In the Matter of William Kelley Braswell, M.D., dated November 5, 2003, *attached to* Amended Complaint, at 139, 143. On November 20, 2003, the Fair Hearing Committee concluded that while "there [were] legitimate and serious concerns regarding Dr. Braswell's preoperative assessment and postoperative management of the cases presented, [and there was] [i]nadequate documentation of many cases[,] ... the evidence did not support summary suspension, and that other avenues of corrective action ... could have been investigated by the [MEC] prior to summary suspension." Exhibit D, Memorandum from Fair Hearing Committee to MEC, dated November 20, 2003, *attached to* Amended Complaint. The Committee also noted the Plaintiff "was not afforded ample opportunity to respond to the allegations made prior to summary suspension" and "the hospital's proper flow of information ... appeared to be lacking." *Id.*

Following the receipt of this opinion of the Fair Hearing Committee, the MEC declined to adopt the opinion and formed an appellate committee to review the deci-

sion once again. Amended Complaint, ¶ 38, 39. The record is not clear whether Plaintiff was able to represent his interests before the Appellate Review Committee. However, Plaintiff alleges that two members of the Committee refused to recuse themselves which indicates to the Court that Plaintiff had some involvement in order to request the recusals. *See id.*, ¶¶ 40, 41. After completing the review, the Appellate Review Committee recommended to continue the summary suspension of Plaintiff's medical privileges. *Id.*, ¶ 39. On February 26, 2004, the Hospital's full Board of Commissioners affirmed the decision of the Appellate Review Committee and notified the Plaintiff of its action on March 1, 2004. *Id.*, ¶¶ 42, 43. The Plaintiff's suspension was subsequently reported to the National Practitioner Databank and the North Carolina Medical Board. *Id.*, ¶ 43.

### 5) Recredentialing with WestCare Health System

In February 2004, as part of a routine recredentialing of the Plaintiff by West-Care Health System ("WestCare"), a hospital where the Plaintiff also had surgical privileges, WestCare requested information and records from the Defendant Hospital about the Plaintiff. Amended Complaint, ¶ 44. Defendant responded that it would not provide any information unless the Plaintiff agreed to sign a release. *Id.*, ¶¶ 45, 46. The Plaintiff refused to sign the release, and because WestCare did not receive any information, it subsequently denied the Plaintiff's reappointment to that hospital and terminated Plaintiff's medical privileges. *Id.*, ¶ 47. WestCare then reported this to the National Practitioner Database and the North Carolina Medical Board. *Id.*, ¶ 48.

On May 17, 2004, Plaintiff filed this action against Haywood County Hospital, Dr. Lipham, and the members of the Surgical Review Committee. Plaintiff alleged violations of his constitutional rights under 42 U.S.C. § 1983, namely the rights to due process and to freedom of speech. Plaintiff also alleged breach of contract, tortious interference with contractual relations, and defamation in violation of state law. Defendants filed their motion to dismiss under Rule 12(b)(6) on July 12, 2004, and a timely response was filed thereto. Defendant declined the opportunity to file a reply brief.

### III. MOTION TO DISMISS PLAINTIFF'S SECTION 1983 CLAIMS

#### A. Due Process Claim

■ Due process "[a]t its elementary level ... requires 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Richardson v. Town of Eastover*, 922 F.2d 1152, 1160 (4th Cir.1991) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). Further, "an impartial decision maker is an essential element of due process." *Bowens v. N.C. Dep't of Human Resources*, 710 F.2d 1015, 1020 (4th Cir.1983). Therefore, even if Braswell had received sufficient notice and opportunity to be heard to satisfy due process concerns, his claim may still survive Defendant's motion to dismiss if he has sufficiently pled bias on the part of the decision makers.

■ To run afoul of due process, "personal bias must stem from a source other than knowledge a decision maker acquires from participating in a case." *Simpson v. Macon County, N.C.*, 132 F.Supp.2d 407, 411 (W.D.N.C.2001) (internal quotations omitted). The Supreme Court has defined such bias as where the decision maker has a "substantial pecuni-

ary interest" or competitive interest in the decision before him. *Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *see also, Stivers v. Pierce,* 71 F.3d 732, 742 (9th Cir.1995) ("The Supreme Court has held [due process is violated] when [a tribunal's] members have a direct and substantial competitive interest in the outcome of the proceedings before them."). The Plaintiff bears the heavy burden of proving bias and "must overcome a presumption of honesty and integrity in those serving as adjudicators." *Simpson, supra* (internal quotations omitted).

 The Court finds that, viewing the facts alleged in the amended complaint as true, Plaintiff can prove personal bias in violation of due process and entitling him to relief. Members of the MEC, the Surgical Case Review Committee, and the Appellate Review Committee included among others, surgical competitors of the Plaintiff, some of which were also involved in a recruiting dispute with the Plaintiff in previous years over the hiring of additional surgeons. As alleged in the amended complaint, Plaintiff can prove that, given the number of surgical competitors in the community, these physicians stood to gain financially from the suspension of the medical privileges of one of their competitors, and therefore, had a "substantial pecuniary interest" in the outcome.[3]

· Therefore, Defendant's motion to dismiss for failure to state a claim is denied as to Plaintiff's § 1983 claim alleging violations of Plaintiff's due process rights.[4]

**B. First Amendment Claim**

 The Plaintiff alleges the Defendants violated his First Amendment rights by retaliating against him for writing a letter to an applicant of another surgical practice stating that the applicant's hiring would exceed the State's recommended surgeon population density. In order to prove a violation of his right to freedom of speech, Plaintiff "must show *first* that the expressions which are alleged to have provoked the retaliatory action relate to matters of public concern." *Huang v. Board of Governors of Univ. of N.C.,* 902 F.2d 1134, 1140 (4th Cir.1990). "Whether an expression involves a matter of public concern is a question of law[,]" which may be properly determined on a motion to dismiss under Rule 12(b)(6). *Id., see also, Huntsinger v. Board of Directors of E–470 Pub. Highway Auth.,* 35 Fed. Appx. 749, 756 (10th Cir.), *cert. denied,* 537 U.S. 1029, 123 S.Ct. 557, 154 L.Ed.2d 443 (2002) ("[T]he motive aspects of [the] inquiry [of whether an expression relates to a matter of public concern] can be resolved without evidence, on a motion to dismiss, where, as here, [the] plaintiff can prove no facts to establish that her motive for speaking was other than personal.").

 According to the Fourth Circuit, the determination of whether Braswell's letter relates to a matter of public concern "rests on 'whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee.'" *Edwards v. City*

---

3. The Court notes that to ultimately prove his due process claim based on personal bias, the Plaintiff bears a heavy burden of putting forth evidence of the presence of "actual bias or a high probability of bias." *Simpson,* 132 F.Supp.2d at 411.

4. Plaintiff also alleges he was denied proper notice and opportunity to be heard in violation of his right to due process. Because the Court finds that he has properly pled a violation of his due process rights on the grounds of bias, the Court will not address the sufficiency of notice and opportunity to be heard provided to the Plaintiff.

*of Goldsboro,* 178 F.3d 231, 246 (4th Cir. 1999) (quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Further, public concern involves an issue of social, political, or other interest to a community. *Urofsky v. Gilmore,* 216 F.3d 401, 407 (4th Cir.2000). The determination of whether an expression is related to a public concern must be made while taking into account "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

While Dr. Braswell undoubtedly had a personal interest in writing the letter to the surgical applicant, the Court is convinced that drawing awareness to the excessive number of surgeons in the community, in relation to the recommended surgeon population density guidelines published by the State of North Carolina, qualifies as a matter of public concern. *See Finn v. New Mexico,* 249 F.3d 1241, 1248 (10th Cir., 2001) (finding that while plaintiff spoke on some personal matters, he also mentioned matters which qualified the expression as relating to public concerns); *cf. Huntsinger, supra* (finding plaintiff's expression related *solely* to matters of personal concern and, therefore, granting defendant's motion to dismiss on First Amendment claim). The State of North Carolina presumably would not allocate its resources and publish recommendations of surgeon population densities if they did not relate to some public concern. Therefore, the Court finds that Braswell's letter qualifies for protection under the First Amendment because it relates to a matter of public concern.

▪ Following a finding that the Plaintiff's expression relates to a matter of public concern, the Plaintiff must then show that the alleged retaliatory conduct by the Defendants "deprived him of some valuable benefit."[5] *Huang, supra.* Not every reaction taken by an employer in response to an employee's exercise of protected First Amendment rights constitutes actionable retaliation. *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000); *DiMeglio v. Haines,* 45 F.3d 790, 806 (4th Cir.1995) ("Not every restriction is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory."). The Fourth Circuit has noted the general trend of the courts in determining what conduct sustains a First Amendment claim:

> a public employer [satisfies the standard] when it refuses to rehire an employee because of the exercise of those rights[;] or when it makes decisions, which relate to promotion, transfer, recall, and hiring, based on the exercise of an employee's First Amendment rights. On the other hand, courts have declined to find that an employer's actions have [satisfied the standard] where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands.

*Suarez Corp.,* 202 F.3d at 686 (internal quotations and citations omitted).

▪ If the Plaintiff's alleged retaliatory conduct is determined to deprive the Plaintiff of a valuable benefit, in order to succeed on his claim the Plaintiff must then show a causal relationship between the expression of public concern and the retaliatory conduct alleged. Under this "rigorous" requirement, the Plaintiff must show that "'but for' the protected expression the employer would not have taken

---

5. The Fourth Circuit has also defined the second element as "that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech." *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 686 (4th Cir.2000).

the alleged retaliatory action." *Huang, supra.*

The Plaintiff has alleged that in retaliation for writing the letter to the surgical applicant, the Hospital's Board of Commissioners chastised him for "meddling in Board recruiting activities," the Hospital's Chief of Staff became openly hostile to him, the Hospital immediately withdrew financial support and employment guarantees previously made to the Plaintiff's prospective new surgeon, and the Hospital subsequently suspended all of the Plaintiff's medical privileges.

Under the general rule espoused in *Suarez,* the Court finds the only actionable allegations of retaliation are the withdrawal of financial support to Plaintiff's prospective new surgeon and the suspension of Plaintiff's medical privileges. Plaintiff's allegations that the Board of Commissioners chastised him for his protected speech, or that Dr. Lipham acted with open hostility towards him, are mere criticism or verbal reprimands, and do not reach the level of constituting a deprivation of a valuable government benefit to sustain a claim under the First Amendment. However, Plaintiff's other allegations, as pled, do satisfy this standard. The withdrawing of an offer of financial support and employment guarantees to Plaintiff's prospective new surgeon could constitute a financial loss to the Plaintiff and his clinic. *Cf., Reiff v. Sullivan,* 64 F.3d 659 (table), 1995 WL 507244, at * 3 (4th Cir.1995) (finding no deprivation had been alleged in part because "Reiff has provided no evidence of any financial or other loss suffered by him"). Additionally there is no doubt that the suspension of Plaintiff's medical privileges represents a deprivation of a valuable government benefit. *Echtenkamp v. Loudon County Pub. Schools,* 263

F.Supp.2d 1043, 1059 (E.D.Va.2003) ("[D]ismissal is clearly sufficient under this test. . . .").

Viewing all of facts in Plaintiff's amended complaint as true in considering Defendant's motion to dismiss, Plaintiff has also pled sufficient causation as to these two allegations to defeat Defendants' motion. As to the withdrawal of the Hospital's offer of financial support and guarantees to Plaintiff's prospective new surgeon, the temporal proximity between the Plaintiff's letter and the Hospital's alleged actions, alone, satisfies Plaintiff's burden to plead causation. *See Saleh v. Upadhyay,* 11 Fed.Appx. 241, 256 (4th Cir.2001) ("As to the element of causation, the temporal proximity . . . supports the inference that [the defendants] instigated a challenge to [the plaintiff's] tenure in response to protected activity"). While temporal proximity is not present with regard to the alleged retaliatory act of suspending Plaintiff's medial privileges,[6] a causal relationship is pled based on the allegations that Dr. Lipham, who was particularly offended by Plaintiff's letter given his wife's involvement in the Hospital's recruiting process, spearheaded the effort to enact the suspension. The Court finds that Plaintiff could prove sufficient causation, given Dr. Lipham's alleged involvement, to sustain a claim under section § 1983. *See Echtenkamp,* 263 F.Supp.2d at 1060 (finding the plaintiff had sufficiently pled causation, in part, because "under the facts as alleged, [the defendant], who appears to have borne the brunt of plaintiff's [protected] criticism, [was] the driving force behind the retaliatory actions").

### C. Absolute Immunity

 Defendants claim they are entitled to absolute immunity from § 1983

---

**6.** Plaintiff's letter was written in early 2001 while his medical privileges were not sus-

pended until June 2003.

liability because of the judicial nature of their role. Absolute immunity is generally reserved for "judges performing judicial acts within their jurisdiction, ... prosecutors performing acts intimately associated with the judicial phase of the criminal process, ... and quasi-judicial agency officials whose duties are comparable to those of judges or prosecutors when adequate procedural safeguards exist." *Ostrzenski v. Seigel,* 177 F.3d 245, 249 (4th Cir.1999) (internal quotations omitted). Because courts have often found members of state medical disciplinary boards within the third category of those identified in *Ostrzenski* and, thus, enjoying absolute immunity, the Defendants argue absolute immunity should also be extended to members of local public hospital disciplinary and peer review boards.

However, those subject to state medical disciplinary board review are afforded procedural protections not afforded to those subject to local hospital peer review boards. *See Moore v. Gunnison Valley Hosp.,* 310 F.3d 1315, 1320 (10th Cir.2002) (finding peer review process at local public hospital was not entitled to absolute immunity). A review at the direction of a state medical board involves direct oversight by a state agency and in many cases a right to appeal to that agency, characteristics not found in a local hospital peer review board. *Id.* ("[The cases involving state medical board peer reviews] involved direct oversight by a government agency as well as a right to appeal to that agency.").

Further, the Supreme Court has identified several factors for a court to consider, where applicable, when determining if a party warrants absolute immunity from liability:

(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the' process; and (f) the correctability of error on appeal.

*Cleavinger v. Saxner,* 474 U.S. 193, 202, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (citing *Butz v. Economou,* 438 U.S. 478, 512, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)). Examining the *Cleavinger* factors with regard to the facts as alleged by the Plaintiff in his amended complaint, the Court finds the peer review process provided by the Defendant Hospital lacks important characteristics found in judicial bodies to be entitled to absolute immunity.

While the lack of absolute immunity will expose participants in the Hospital's peer review process to potential harassment through frivolous lawsuits, the process appears to lack insulation from political influences, adequate procedural safeguards, and adversarial characteristics typically found in judicial bodies. For example, as discussed previously, Plaintiff has alleged personal bias of some of the committee participants based on their competing practices in the small medical community of Haywood County. Additionally, Plaintiff alleges he was not given the opportunity to be heard on all issues considered during the peer review process which resulted in the suspension of his medical privileges. Instead, Plaintiff claims he was allowed to present evidence regarding one patient whose care was under consideration during the process, but was not present or allowed to be heard while other issues were considered. Further, while Plaintiff was afforded a right to appeal his summary suspension under the Hospital by-laws, the MEC refused to accept the findings and recommendations of the Fair Hearing Committee and instead created another committee, made up of some of its

own members, to appeal the decision again.

Therefore, the Court finds the Defendants are not entitled to absolute immunity. *See Moore, supra* (finding that the hospital's peer review board lacked the characteristics of judicial body to be afforded absolute immunity).

### D. Qualified Immunity

 In the alternative, Defendant asserts it is entitled to qualified immunity. While § 1983 "on its face admits of no immunities[,] ... [the courts] have accorded certain government officials [with] ... qualified immunity from suit if the tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine." *Heck v. Humphrey,* 512 U.S. 477, 493 n. 1, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (internal quotations omitted).

Congress, in passing the Health Care Quality Improvement Act of 1986 ["HCQIA"], 42 U.S.C. §§ 11101, *et. seq,* has recognized the strong policy reasons for granting qualified immunity from money damages to hospitals, doctors, and others who participate in the professional peer review process. *See, Imperial v. Suburban Hosp. Assn., Inc.,* 37 F.3d 1026, 1028 (4th Cir.1994). The Act provides qualified immunity where the peer review activities have met the specific standards imposed by the Act. *See,* 42 U.S.C. § 11111(a)(1) (granting immunity where specified standards of 42 U.S.C. § 11112(a) have been met). However, Congress specifically provided that qualified immunity did not extend to actions for damages for violations of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et. seq,* and the Civil

Rights Act, 42 U.S.C. §§ 1981, *et. seq. See,* 42 U.S.C. § 11111(a)(1). Therefore, under Congress' explicit exclusion, Defendant is not entitled to qualified immunity with respect to Plaintiff's § 1983 claims alleging violations of his First Amendment and due process rights.[7] *See, e.g., Austin v. McNamara,* 979 F.2d 728, 733 (9th Cir. 1992) ("[42 U.S.C. § 11111] excludes from its coverage suits brought under 42 U.S.C. § 1983[.]"); *Reyes v. Wilson Mem'l Hosp.,* 102 F.Supp.2d 798, 821 (S.D.Ohio 1998) ("Because the HCQIA does not provide any immunity from damages for violations of § 1983, the Court must conclude that HCQIA immunity does not attach to Count Two."); *Rogers v. Columbia/HCA of Cent. Louisiana, Inc.,* 971 F.Supp. 229, 237 (W.D.La.1997) ("HCQIA immunity does not shield the defendants from liability for violating the United States Constitution."); *Johnson v. Greater Southeast Cmty. Hosp. Corp.,* 1996 WL 377147, at *4 (D.D.C.1996) ("[42 U.S.C. § 11111] excludes from its coverage civil rights suits brought under 42 U.S.C. § 1983 or Title VII of the Civil Rights Act of 1964 ...").

## IV. MOTION TO DISMISS PLAINTIFF'S STATE LAW CLAIMS

### A. Federal Peer Review Privilege

 Plaintiff has also alleged state law claims of breach of contract, tortious interference with contractual relations, and defamation. Given that the Court has not dismissed Plaintiff's § 1983 claims, Defendant moves the Court to dismiss the state law claims on the grounds that the Court should apply a federal peer review privilege to all documents related to medical peer review privileges. Defendants argue that because Plaintiff relied on many docu-

---

**7.** Defendants entitlement to qualified immunity under the HCQIA from Plaintiff's state law claims will be discussed in the next section.

ments that would be privileged under a federal peer review privilege, he has not adequately pled his state law claims, and thus, they should be dismissed.

The Fourth Circuit has defined the applicable law concerning a federal peer review privilege. *See, Virmani v. Novant Health Inc.,* 259 F.3d 284 (4th Cir.2001). In that case, the Court·found that in a discrimination claim, application of a federal peer review privilege was not appropriate, because the evidence that would be privileged was "crucial to·his attempt to establish that he [had] been the subject of disparate treatment on the basis of race and ethnicity." *Id.,* at 289. The Court found that "[t]he interest in facilitating the eradication of discrimination by providing the only evidence that can establish its occurrence outweigh[ed] the interest in promoting candor in the medical peer review process." *Id.* However, the Court noted that in medical malpractice actions, where the claim "arises from actions that occurred independently of the review proceedings,"· the application of the federal privilege may be more appropriate. *Id.,* at 290–91.

The Defendants argue that the due process and First Amendment claims at issue in this case are more analogous to a medical malpractice claim than a discrimination claim, and therefore, under the reasoning in *Virmani,* the federal peer review privilege should be applied. However, the Court finds that Plaintiff's claims at issue are more analogous to a discrimination claim, and as so, directly concern the actions that took place during the peer review process. Plaintiff alleges that members of the peer review‾ committees that reviewed his patients' care held personal bias towards him because they were in direct competition with him. Additionally, Plaintiff has alleged that the peer review committees involved in his review did not properly consider his explanation for the

treatment decisions he made. Plaintiff's claims directly involve the operation and procedures of the peer review committees. Like the Fourth Circuit in *Virmani,* this Court finds the·interest in adjudicating Plaintiff's due process and First Amendment claims outweighs the interest in facilitating candor in medical peer review proceedings. Therefore, under Plaintiff's claims, the Court refuses to adopt a federal medical peer review privilege..

## B. Qualified Immunity under the HCQIA

 While the Court has determined that the HCQIA qualified immunity is not applicable to Plaintiff's § 1983 claims, it still may be available to the Defendants against the Plaintiff's state law claims. As discussed *infra,* the HCQIA provides absolute immunity from money damages to hospitals, doctors and others who participate in the professional peer review processes where the specified standards of § 11112(a) have been satisfied. Section 11112(a) requires that:

> a professional review action must be taken—(1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable ·effort to obtain facts and after meeting the requirement of paragraph (3). ·

42 U.S.C.A. § 11112(a). Viewing the facts alleged by the Plaintiff as true, Defendants' proceedings have not met the requirements of § 11112(a). Plaintiff has alleged that he was not provided. fair procedures under the circumstances because

those individuals reviewing his patient care were personally biased against him.[8] Therefore, the Court cannot determine that Defendants are entitled to qualified immunity under the HCQIA at this stage in the proceedings.

## C. Plaintiff's Claims of Tortious Interference with Contractual Relations

■ Plaintiff alleges that the Defendant Hospital wrongfully interfered with the Plaintiff's contractual relations by refusing to send the Plaintiff's records to WestCare in response to a request made pursuant to a routine recredentialing. As a result, WestCare terminated Plaintiff's contractual medical privileges and Plaintiff was unable to fulfill his contracts with his patients at WestCare. The Defendant Hospital responds that it had no duty under state or federal law to send the hospital records and, therefore, did not act unlawfully.

■ Under North Carolina law, to state a claim for tortious interference with contract, a plaintiff must allege the following elements:

> "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff."

*Holroyd v. Montgomery County*, 606 S.E.2d 353, 358 (N.C.App.2004) (quoting *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)). To prove the interference was made without justification, "the action must indicate no motive for interference other than malice." *Area Landscaping, L.L.C. v. Glaxo–Wellcome, Inc.*, 160 N.C.App. 520, 523, 586 S.E.2d 507, 510 (2003) (internal quotations omitted). Malice in this sense "does not import ill will, but refers to an interference with design of injury to plaintiff[ ] or gaining some advantage at [his] expense." *Walker v. Sloan*, 137 N.C.App. 387, 393, 529 S.E.2d 236, 241–42 (2000) (quoting *Coleman v. Whisnant*, 225 N.C. 494, 506, 35 S.E.2d 647, 656 (1945)).

■ Plaintiff has alleged the Defendant Hospital acted maliciously by stating it would only send Plaintiff's records to WestCare if the Plaintiff signed a release of all claims against the Hospital.[9] Plaintiff alleged that under the terms of the release, he would have been required to give up all claims including those for violation of his First Amendment and due process rights. However, the actual terms of the release, attached to the Plaintiff's amended complaint, are not nearly as broad. *See Chalal v. Northwest Med. Cen., Inc.*, 147 F.Supp.2d 1160, 1178 n. 10 (N.D.Ala.2000) (cursory reading of the release showed the court it was a limited release of claims related to the sending of the letter of reference and not a general release as the plaintiff claimed). The release instead only incorporates those claims "related to or in anyway connected with the furnishing of the Requested Information to WestCare, Inc." Exhibit F, *attached to* Plaintiff's Amended Complaint. The plain language of the release limits its applicability only to those claims the Plaintiff could assert associated with the Hospi-

---

**8.** Further, Plaintiff has alleged he was not given proper notice and the opportunity to be heard on all the matters considered by the Defendant Hospital in summarily suspending his medical privileges.

**9.** The proposed release would have released the Hospital from all claims "related to or in anyway connected with the furnishing of the Requested Information to WestCare, Inc." Exhibit F, *attached to* Plaintiff's Amended Complaint.

tal's reporting of Plaintiff's records to WestCare. For example, it would not extend to release the Defendant Hospital from Plaintiff's claims for violations of his due process and First Amendment rights, discussed *infra*, as Plaintiff alleges, because these claims are not connected in any way with the records requested. Where there is a conflict "between the bare allegations of the complaint and any exhibit attached [to the complaint] pursuant to Rule 10(c)[,] ... the exhibit prevails." *Fayetteville Investors, supra.* Given the Plaintiff has not alleged the Defendant Hospital had an affirmative duty to send the records to WestCare, and in light of the negative nature of the report and the Hospital's potential exposure to liability, the Court finds the Plaintiff has not properly alleged that the Defendant Hospital acted without justification in refusing to send the records without a signed release from Plaintiff. *See Chalal, supra* (finding hospital had no duty to send letter of reference and a refusal to do so without first obtaining a release for claims associated with the letter was justified). Therefore, Plaintiff has not sufficiently pled a claim of tortious interference with contractual relations and Defendants' motion to dismiss is granted as to this claim.

**D. Plaintiff's Other State Law Claims**

Outside of Defendant's arguments for a federal peer review privilege or some form of immunity, which were not accepted by the Court, Defendants' motion to dismiss does not assert other grounds to dismiss Plaintiff's additional state law claims of breach of contract and defamation. Therefore, Defendants' motion to dismiss is denied with regard to these claims.

**IV. ORDER**

**IT IS, THEREFORE, ORDERED** that Defendants' motion to dismiss with regard to Plaintiff's § 1983 claims and his state law claims for defamation and breach of contract is hereby **DENIED.**

**IT IS FURTHER ORDERED** that Defendants' motion to dismiss with regard to Plaintiff's claim for tortious interference with contractual relations is hereby **GRANTED,** and such claims are hereby **DISMISSED WITH PREJUDICE.**

Defendants are directed to file responsive pleadings within 20 days from entry of this Order.